**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI‘I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEVADA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN; DISTRICT OF COLUMBIA,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as the SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and JOSEPH B. EDLOW, in his official capacity as the DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES,

*Defendants*.

Case No. 26-cv-7978

# COMPLAINT

## INTRODUCTION

1. Plaintiff States challenge a final rule issued by Defendants that upends years of established immigration policy. Namely, the final rule challenged here unlawfully removes any meaningful guidelines as to what individual immigration officers may consider in determining if certain non-citizens may be deemed a "public charge"—and therefore denied entry to this country or denied legal permanent residence. Congress never intended for the public charge ground to be weaponized against immigrants and their family members who merely use supplemental or temporary amounts of public assistance to which they are lawfully entitled. Yet that is exactly what Defendants now seek to do through the final rule challenged here.

2. In 1882, Congress enacted a provision of immigration law to allow the United States to deny a non-citizen applicant entry into the United States on the ground that the applicant would be unable to support herself in the future. In its current form, this provision is known as the "public charge ground of inadmissibility." For over 140 years, the term "public charge" has been understood by Congress, the courts, federal agencies, and states to mean an individual who has become, or is likely to become, primarily dependent on the government for long-term subsistence. Congress has consistently incorporated that core meaning, without change, into federal immigration law, from the first federal immigration statute through enactment of the current public charge ground of inadmissibility in 1996, 8 U.S.C. § 1182(a)(4)(A).

3. In 2022, the United States Department of Homeland Security ("DHS") promulgated regulations distilling when an individual is likely to become a "public charge." Consistent with the statutory term's well-established meaning, the 2022 regulations provided that a "public charge" is someone likely to become primarily dependent on the government for subsistence as demonstrated by receipt of public cash assistance for income maintenance or long-term institutionalization at

government expense. The regulations circumscribed agents' discretion in making public charge determinations to ensure that they stayed within the bounds of the law.

4. Yet now, Defendants DHS and United States Citizenship and Immigration Services ("USCIS"), an agency within DHS, have promulgated a new final rule rescinding the 2022 regulations. Public Charge Ground of Inadmissibility, 91 Fed. Reg. 45324 (July 20, 2026) (to be codified at 8 C.F.R. pts. 103 and 212) (the "2026 Final Rule" or the "Final Rule"). Defendants subsequently published a revised chapter of the USCIS Policy Manual concerning the public charge ground of inadmissibility (the "Guidance"). *See* Ex. A. In doing so, Defendants abandon the long-settled understanding of the term "public charge" that Congress ratified, and attempt to bar far more noncitizens from admission under the public charge provision.

5. Defendants replace the 2022 regulations, which codified well-established law, with unfettered discretion for immigration officials to determine who can be excluded on public charge grounds. The Guidance provides no clear bounds on this discretion and enables individual immigration officers to make public charge inadmissibility determinations in ways that fundamentally depart from the core meaning of the term.

6. Ultimately, under Defendants' Final Rule, and in accordance with the Guidance, immigration officers have unprecedented, sweeping new discretion to deny admission, and to block pathways to lawful permanent residency, based on participation in public programs—programs for which Congress or the states elected to extend eligibility to noncitizens or their citizen family members. Non-citizens will be faced with the impossible task of weighing their or their family members' participation in supplemental state and federal programs that improve health, economic mobility, and general well-being, against the negative impacts that such

participation will have on their ability to obtain lawful permanent resident status (also known as "green cards").

7. In fact, according to the Final Rule's expansive new understanding of "public charge," individual USCIS agents will now be able to rely on *any* public benefits use for *any* period of time—and, really, any information at all—in making a public charge inadmissibility determination. For example, individual immigration officers are now empowered to count U.S. citizen household members' lawful use of individual benefits—including, for example, a citizen child's use of state-provided health insurance—against a noncitizen parent. The Final Rule puts families in the untenable position of choosing between a U.S. citizen child's access to healthcare, and their noncitizen parent's ability to remain in the country.

8. The Final Rule, and the Guidance, are inconsistent with the settled meaning—or any other reasonable interpretation—of the Immigration and Nationality Act's ("INA") public charge provision. 8 U.S.C. § 1182(a)(4)(A). In departing from that settled meaning without express authorization from Congress, Defendants have exceeded their statutory authority.

9. In addition, the federal government's decision to issue the Final Rule and the Guidance is arbitrary and capricious. Defendants have failed to engage in the reasoned decision-making process required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Final Rule brushes aside the significant and far-reaching harmful consequences of the regime it creates, while relying on legally erroneous justifications. It fails to consider alternatives that could have minimized the harms that will be caused by the Final Rule, demonstrates no consideration of Plaintiff States' reliance on the prior rule and decades-old administrative practices, and intentionally fails to explain a host of ambiguities created by this rulemaking.

10. As a result of the Final Rule and the Guidance, Plaintiff States, including their agencies, subdivisions, and instrumentalities, will be harmed in predictable ways when noncitizens and their family members—including U.S. citizen children—disenroll from programs for which they remain eligible. Plaintiff States will ultimately be forced to fill the breach, and staggering costs will follow on multiple fronts: Plaintiff States will lose federal funding due to disenrollment in state programs, and public agencies will face substantial administrative costs as they attempt to mitigate confusion and fear. As households forgo their legal access to benefits—such as preventative healthcare, nutritional assistance, and school lunch—public health, local economies, public education, and public safety will suffer. The Final Rule will increase the prevalence of disease, drive up the costs of medical care, and increase poverty.

11. Plaintiff States respectfully request that this Court declare that the Final Rule violates the APA, because it is contrary to law and in excess of Defendants' statutory authority, and is arbitrary and capricious. In the alternative, Plaintiff States respectfully request that this Court declare that the Guidance is a final rule that violates the APA, because it is contrary to law and in excess of Defendants' statutory authority, is arbitrary and capricious, and is a legislative rule improperly not subject to required notice and comment rulemaking.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

13. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district, and Defendants are United States agencies or officers acting in their official capacities.

## PARTIES

### A. Plaintiffs

14. Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Exec. Law § 63 to pursue this action.

15. Plaintiff the State of California is a sovereign state of the United States of America. California Attorney General Rob Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of the State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761–62 (1934) (the Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state[.]").

16. Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

17. Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colorado Revised Statute § 24 31-101 to pursue this action.

18. Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

19. Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

20. Plaintiff the State of Hawaiʻi, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States of America. Attorney General Lopez is the "chief legal officer of the State[,]" Haw. Const. art. V, § 6, and is authorized by statute to pursue this action on its behalf, Haw. Rev. Stat. §§ 26-7, 28-1.

21. Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

22. Plaintiff the State of Maryland, represented by and through its Attorney General Anthony G. Brown, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

23. Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

24. Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer for the State of Michigan.

25. Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

26. Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

27. Plaintiff the State of New Jersey is a sovereign state of the United States. New Jersey is represented by and through Attorney General Jennifer Davenport, who is the chief legal officer of New Jersey.

28. Plaintiff the State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

29. Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

30. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

31. Plaintiff the State of Rhode Island, represented by and through its Attorney General Peter F. Neronha, is a sovereign state of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

32. Plaintiff the State of Vermont is a sovereign state of the United States. Vermont is represented by its Attorney General, Charity Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

33. Plaintiff the Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

34. Plaintiff the State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

35. Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

36. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

**B. Defendants**

37. Defendant United States Department of Homeland Security ("DHS") is an executive branch agency within the federal government, headquartered in Washington, D.C.

38. Defendant Markwayne Mullin is the Secretary of DHS. He is sued in his official capacity.

39. Defendant the United States Citizenship and Immigration Services ("USCIS") is a component of DHS, 6 U.S.C. § 271, and is an agency, 5 U.S.C. § 551(1).

40. Defendant Joseph B. Edlow is the Director of USCIS, and its highest-ranking official. He is charged with establishing policies for USCIS, and for overseeing the administration of policies, decisions, and actions of that agency. 6 U.S.C. § 271(a)(3). He is sued in his official capacity.

**ALLEGATIONS**

41. This case concerns the interpretation and application of the public charge ground of inadmissibility, a longstanding provision of the federal Immigration and Nationality Act ("INA"). The INA requires that noncitizens seeking to be lawfully admitted to the United States, or noncitizens who are already present and seeking to become lawful permanent residents ("LPRs"), prove that they are "not inadmissible." 8 U.S.C. § 1361.

42. The public charge ground of inadmissibility bars admission of any noncitizen who, "in the opinion of the [Secretary of DHS] at the time of application for admission [to the United States] or adjustment of status, is likely at any time to become a public charge[.]" 8 U.S.C. § 1182(a)(4)(A).

43. A person who is applying to USCIS for "admission" to the United States is typically a noncitizen who has already been subject to inspection and authorized by border officials. *Id.* 8 U.S.C. § 1101(a)(13). Noncitizens applying for admission with USCIS include individuals who are permitted to be in the country for a specified purpose and a temporary period of time, whether they enter with a nonimmigrant intent (e.g., certain tourists or students), or immigrant intent (e.g., limited visas for fiancés of U.S. citizens).[1]

44. A person who is "adjusting status" is typically a noncitizen who was already admitted (generally as a visa-holder) or paroled to the United States, is physically present, and is now seeking to adjust to LPR status. *See generally* 8 U.S.C. § 1255(a).

45. Noncitizens who are applying for admission or for an adjustment of status are subject to the public charge ground of inadmissibility. 8 U.S.C. § 1182(a)(4).

### A. Historical, Statutory, and Regulatory Background

#### 1. The Immigration Act of 1882

46. The term "public charge" was first introduced into federal law in 1882, when Congress provided that any noncitizen "convict, lunatic, idiot, or any person unable to take care of

---

[1] Grounds of inadmissibility, including the public charge ground, are assessed at various times for a noncitizen. Because of this, DHS is not the only agency that makes public charge inadmissibility determinations. The United States Department of State ("DOS") assesses noncitizens' public charge inadmissibility when considering visa applications and various other immigration benefit applications from noncitizens abroad. The United States Department of Justice ("DOJ") adjudicates cases concerning deportation of noncitizens who were previously admitted, but alleged to have become "public charges" within 5 years of entry (and therefore may be subject to inadmissibility determinations again, even when previously admitted). *See* 8 U.S.C. § 1227(a)(5). This case concerns the public charge ground of inadmissibility as interpreted and administered by Defendants, including DHS, and not as administered by DOS or DOJ.

[themselves] without becoming a public charge" be excludable and prevented from entering the country. Immigration Act of 1882, Pub. L. No. 47-376, ch. 376, § 2, 22 Stat. 214.

47. At the same time, Congress created a fund "for the support and relief" of arriving immigrants who "may fall into distress or need public aid." *Id.* §§ 1-2, 22 Stat. at 214. This fund for immigrants was used in part "for protecting and caring for" immigrants from "when they arrive[d]…until they [could] proceed to other places or obtain occupation for their support." 13 Cong. Rec. 5106 (1882) (Rep. Reagan). In creating this fund, Congress drew a distinction between recently-arriving immigrants who may have needed assistance in transitioning to a new homeland, versus those who would become "public charges" because they would be primarily dependent on public benefits for subsistence.

48. Over the years, Congress repeatedly reenacted public charge provisions, after courts interpreted it as being limited to the few individuals who were unable to support themselves and were thus likely to depend almost entirely on the government for long-term subsistence. *See, e.g.*, *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915) ("public charge" means individuals unable to work due to "permanent personal objections"); *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917) ("Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future.").

**2. The Immigration and Nationality Act of 1952**

49. In 1952, Congress ratified the courts' consistent understanding of "public charge" when it included the public charge ground of inadmissibility "without pertinent change" into the original version of the INA. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 70 (2d Cir. 2020), *cert. granted*, 141 S. Ct. 1370 (2021), *cert. dismissed*, 141 S. Ct. 1292 (2021).

50. As the Second Circuit concluded, between the 1952 Act and 1996, "[t]he absolute bulk of the caselaw, from the Supreme Court, the circuit courts, and the [Board of Immigration Appeals (BIA)] interpret[ed] 'public charge' to mean a person who is *unable* to support herself, either through work, savings, or family ties." *Id.* at 71 (emphasis added).

**3. The 1996 Laws: PRWORA and IIRIRA**

51. In 1996, Congress passed two pieces of legislation concerning noncitizen eligibility for public benefits: the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, § 403, 110 Stat. 2105, 2265-67 (1996), which became law on August 22, 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996), which became law on September 30, 1996.

52. PRWORA limited noncitizen eligibility for certain public benefit programs. The statute's policy statement explained that Congress intended to create "new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy." 8 U.S.C. § 1601(5).

53. Throughout the preamble to the 2026 Final Rule, Defendants rely upon PRWORA's policy statement and the "spirit of PRWORA" as justification for why, in Defendants' view, the Final Rule was needed. *See, e.g.,* 91 Fed. Reg. at 45361 ("DHS points to our national policy on welfare and immigration as set forth in PRWORA as a sufficient basis to move forward with this final rule.").

54. But PRWORA did not address or change the meaning of the term "public charge" in any way, and when Defendants previously argued that PRWORA justified a new definition of

the inadmissibility ground, the Second Circuit was "thoroughly unpersuaded." *New York*, 969 F.3d at 77.

55. Indeed, PRWORA preserved noncitizen access to a number of public benefits, ranging from optional state-only benefits, 8 U.S.C. § 1621(d), to emergency disaster relief, immunizations, emergency shelter, and more. 8 U.S.C. § 1611. Congress also recognized that certain nutritional programs, including school lunch and breakfast, had independent statutory bases, and those statutes required that these meals be provided to school children irrespective of citizenship or immigration status. *See, e.g.*, Richard B. Russell National School Lunch Act, 42 U.S.C. §§ 1751–1769. PRWORA did not change the independent statutory requirements that access to these programs not be restricted based on citizenship or immigration status, and instead codified Congress's decision that these benefits continue to be available to citizens and noncitizens alike. 8 U.S.C. § 1615.

56. As the Second Circuit explained, PRWORA does not "indicate any congressional intention that non-citizens who receive the benefits for which Congress did *not* render them ineligible risk being considered 'public charges.'" *New York*, 969 F.3d at 77.

57. In September 1996, weeks after the enactment of PRWORA, Congress also passed IIRIRA, which amended the INA. In IIRIRA, Congress left the principal statutory language for the public charge ground of inadmissibility intact and amended the law to require that immigration officials consider five factors in making public charge determinations: age, health, family status, financial status, and education. 8 U.S.C. § 1182(a)(4)(B)(i).

58. IIRIRA also imposed a new requirement that noncitizens seeking admission as immigrants based on family ties obtain affidavits of support, in which a sponsor agrees to maintain the would-be immigrant at an income of no less than 125% of the Federal Poverty Guidelines. *Id.*

§§ 1182(a)(4)(C), 1183a(a)(1). Where applicable, these affidavits of support may be considered as a sixth, discretionary factor in making public charge determinations. 8 U.S.C. §§ 1181(a)(4)(B)(ii), 1183a(a)(1).

59. In passing IIRIRA, Congress rejected the inclusion of a provision that would have redefined "public charge" to include noncitizens who received federal public benefits "for an aggregate of 12 months over a period of 7 years." 142 Cong. Rec. S11872 (daily ed. Sept. 30, 1996) (statement of Sen. Kyl). Congress also chose not to incorporate language it had previously considered to apply a broader "means-tested public benefit" definition to "public charge." *See* IIRIRA Conference Report - H. Rep. No. 104-828 at 138 (proposing adding "means-tested public benefit" language to public charge ground of deportation), 238 (discussing definition of "means-tested public benefit"), 240-41 (amending public charge ground of inadmissibility).

60. The same Congress that enacted IIRIRA and PRWORA in 1996 also was presented with, and considered and rejected, another attempt to broaden the scope of "public charge." A proposed Immigration Control and Financial Responsibility Act ("ICFRA") would have changed the definition of "public charge" for deportability purposes to include noncitizens who used nearly any public benefit for over a year (with some exceptions). H.R. 2202 § 202(a)(5)(D). The Senate rejected this bill. S. Rep. No. 104-249 (1996).

61. The 1996 reenactment of the public charge ground of inadmissibility through IIRIRA thus "remove[d] any doubt" that Congress had ratified the settled meaning of the term "public charge" as it had been construed since the earliest federal immigration laws to have used the term: "a person who is unable to support herself, either through work, savings, or family ties." *New York*, 969 F.3d at 70–71.

**4. 1999 Field Guidance and Proposed Rule**

62. After the passage of PRWORA and IIRIRA, the Immigration and Naturalization Services ("INS"), the agency responsible for the administration of immigration law before the creation of DHS, observed widespread "confusion about the relationship between the receipt of federal, state, [and] local public benefits and the meaning of 'public charge' under the immigration laws." Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28689 (May 26, 1999) (the "1999 Field Guidance").

63. Concerned that confusion was "deterr[ing] eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they [we]re legally entitled to receive," INS issued the 1999 Field Guidance memorializing the established meaning of the term "public charge." 64 Fed. Reg. at 28692. In doing so, INS observed that public benefits—other than public cash assistance for income maintenance and institutionalization for long-term care at government expense—"are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." *Id.* The 1999 Field Guidance was published in the Federal Register on the same day as the related notice of proposed rulemaking. "Inadmissibility and Deportability on Public Charge Grounds," 64 Fed. Reg. 28676 (May 26, 1999) (the "1999 Proposed Rule").

64. In the 1999 Proposed Rule, INS defined "public charge" as a noncitizen who is "primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." 64 Fed. Reg. at 28677. The agency concluded that this interpretation was warranted by "the plain meaning of the word 'charge,' the historical context of public dependency when the public charge immigration provisions were first enacted," "the expertise of the benefit-

granting agencies that deal with subsistence issues," and the "factual situations presented in the public charge case law." *Id*. The 1999 Proposed Rule was ultimately not finalized, but the related 1999 Field Guidance remained effective.

65. In developing the 1999 Field Guidance, INS consulted with various federal benefit-granting agencies, including the U.S. Department of Health and Human Services, the Social Security Administration, and the U.S. Department of Agriculture ("USDA"), to determine which types of receipt of public benefits indicated that an individual was or was likely to become a "public charge." 64 Fed. Reg. at 28692; *see also* 64 Fed. Reg. at 28677.

66. The 1999 Field Guidance identified four specific public benefits for which receipt could be considered for public charge purposes because they demonstrated "primary dependence" on the government for subsistence: (i) Supplemental Security Income ("SSI"), a cash assistance program for older adults and persons who are blind or otherwise disabled; (ii) Temporary Assistance for Needy Families ("TANF"), a cash assistance program for families living in poverty; (iii) state and local cash assistance programs (also known as "General Assistance"); and (iv) any program, including Medicaid, supporting people institutionalized for long-term care purposes. 64 Fed. Reg. at 28692-93.

67. INS explained in the 1999 Field Guidance that, based on their "extensive consultations with [federal] benefit-granting agencies," receipt of other types of public benefits, especially non-cash benefits, were not relevant to public charge determinations because those benefits are "by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." *Id*. at 28692. Instead, the 1999 Field Guidance directed that immigration officials should determine whether to exclude an individual on public charge grounds by considering the receipt of public cash benefits provided for income maintenance

or long-term institutionalization at government expense, as part of a "totality of the circumstances" test. *Id*. at 28690-92.

68. For the next 20 years, the federal government continued to interpret the term "public charge" consistent with the 1999 Field Guidance and over a century of prior precedent.

**5. The 2019 Final Rule**

69. During the first Trump administration, the federal government changed course, relying on the policy statement from PRWORA that noncitizens should be "self-sufficient" as a basis for redefining "public charge." *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41292 (Aug. 14, 2019) (the "2019 Rule").

70. The 2019 Rule's unprecedented interpretation of the term "public charge" redefined this term as "an alien who receives one or more public benefits, as defined […], for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)." *Id*. at 41501.

71. The 2019 Rule's regulatory definition of public benefits listed, for the first time, certain federally funded supplemental benefits that are commonly available to individuals above and below the poverty line, and are designed to promote public health, nutrition, and upward mobility, rather than long-term dependency on the government for subsistence. These supplemental benefits included some types of federally funded Medicaid health coverage, benefits under the Supplemental Nutrition Assistance Program ("SNAP"), and federal housing assistance. *Id*.

72. The 2019 Rule led to litigation brought by public and private plaintiffs in multiple jurisdictions across the nation, including in this District. Each district court considering the 2019 Rule concluded that the Rule was likely unlawful, and multiple preliminary injunctions issued

barring the Rule's enforcement. *See New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334 (S.D.N.Y. 2019); *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019); *CASA de Md., Inc. v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019); *Cook Cty. v. McAleenan*, 417 F. Supp. 3d 1008 (N.D. Ill. 2019); *City and Cty. of S.F. v. U.S. Citizenship and Immigr. Servs*., 408 F. Supp. 3d 1057 (N.D. Cal. 2019).

73. The Second Circuit affirmed the District Court's preliminary injunction and concluded that the term "public charge" had a "sufficiently consistent and settled meaning," such that courts could "presume Congress ratified that understanding when it created the current public charge statute in 1996." *New York*, 969 F.3d at 70.

74. The Second Circuit concluded that a "public charge" under the INA means "a person who is unable to support herself, either through work, savings, or family ties." *Id.* at 71. A public charge "rel[ies] on the government for subsistence." *Id.* at 74. "[M]ere receipt of benefits from the government" does not, on its own, constitute this type of dependency. *Id.* The Court rejected the 2019 Rule's legal conclusion that Congress in PRWORA had intended to modify this longstanding definition of "public charge." *Id.* at 77–78.

75. Other reviewing courts agreed that plaintiffs were likely to succeed in their claims that the 2019 Rule violated the APA because it was contrary to law and arbitrary and capricious. *See Cook Cnty. v. Wolf*, 962 F.3d 208, 229 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 1292 (2021); *City and Cnty. of S.F. v. U.S. Citizenship and Immigr. Servs*., 981 F.3d 742, 756–58 (9th Cir. 2020), *cert. dismissed*, 141 S. Ct. 1292 (2021).

76. In November 2020, an Illinois district court issued a final decision vacating the 2019 Rule as contrary to law and arbitrary and capricious, in violation of the APA. *Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1004–05 (N.D. Ill. 2020).

77. On March 15, 2021, DHS issued a final rule implementing the Northern District of Illinois's vacatur of the 2019 Rule. Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14221 (Mar. 15, 2021). As a result, the 2019 Rule was removed from the Code of Federal Regulations and public charge assessments were again controlled by the longstanding 1999 Field Guidance.

**6. The 2022 Final Rule**

78. In 2021, DHS embarked on another rulemaking process, beginning with an "Advance Notice of Proposed Rulemaking" to collect relevant empirical evidence, 86 Fed. Reg. 47025 (Aug. 23, 2021) and then a sixty-day formal notice and comment period, 87 Fed. Reg. 10570 (Feb. 24, 2022).

79. In 2022, DHS promulgated a final rule codifying the long-standing understanding of "public charge." Public Charge Ground of Inadmissibility Final Rule, 87 Fed Reg. 55472 (Sept. 9, 2022) (the "2022 Rule").

80. The 2022 Rule affirmed that a "public charge" meant someone who is "likely at any time to become primarily dependent on the government for subsistence as demonstrated by either the receipt of public cash assistance for income maintenance, or long-term institutionalization at government expense." 8 C.F.R. § 212.21(a) (2022).

81. In addition, the 2022 Rule reflected DHS's reasoned decision that the harms of the 2019 Rule's expansive public charge policy outweighed any purported benefits. The 2022 Rule examined extensive, relevant data in the administrative record, including reports and studies about the "chilling effects" caused by the 2019 Rule, *i.e.*, widespread disenrollments from benefits, by both noncitizens and their citizen family members, due to fear and confusion about how the 2019 Rule would be applied. *See, e.g.*, 87 Fed. Reg at 55491, 55505. It considered "a range of

downstream consequences for the general public and for State and local governments" due to these chilling effects, such as "avoidance of preventive medical care, children's immunizations, and nutrition programs." 87 Fed. Reg. at 55529. DHS found that the 2019 Rule had caused severe, negative effects on the health and wellbeing of noncitizens and their U.S. citizen family members, deterred people who were "not subject to the public charge ground of inadmissibility" from using public benefits, and harmed States' ability to administer a range of programs, from safety net hospitals to school lunch programs. *See, e.g.*, 87 Fed. Reg. at 55504-08.

82. As part of the 2022 Rule's extensive findings regarding the impact of specific public benefit programs, DHS found that supplemental benefits like Medicaid, SNAP, and other public healthcare and nutrition programs helped to promote public health, employment, and self-sufficiency. *See* 87 Fed. Reg. at 55518.

**B. The 2025 Notice of Proposed Rulemaking**

83. In November 2025, DHS and USCIS published a Notice of Proposed Rulemaking regarding the public charge ground of inadmissibility (the "2025 NPRM" or "2025 Proposed Rule") in the Federal Register. Public Charge Ground of Inadmissibility, 90 Fed. Reg. 52168 (Nov. 19, 2025).

84. The 2025 Proposed Rule proposed to "rescind the regulations implemented by the 2022 Final Rule related to the public charge ground of inadmissibility at section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4)." *Id*. at 52180. Specifically, the Proposed Rule would rescind 8 C.F.R. §§ 212.20, 212.21, 212.22, and 212,23, and amend 8 C.F.R. § 103.6(c). *Id*. at 52170.

85. In the 2025 Proposed Rule, Defendants argued that both the 2022 Final Rule and the 2019 Final Rule were "inconsistent with the national policy contained in Executive Order

14218 and PRWORA and the spirit of broad statutory text in section 212(a)(4) of the INA, 8 U.S.C. § 1182(a)(4)." *Id*. at 52180.[2]

86. The 2025 Proposed Rule also included Defendants' assertion that they "believe[d] that [they] must completely remove the public charge inadmissibility framework established by the 2022 Final Rule in order to be more consistent with PRWORA's directive that 'aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations.'" 90 Fed. Reg. at 52182.

87. The 2025 Proposed Rule reflected DHS's belief "that an alien's dependence on any means-tested public benefit to meet his or her needs—and not just his or her dependence on public cash assistance for income maintenance and long-term institutionalization at government expense—is what . . . Congress intended to address with the public charge ground of inadmissibility." 90 Fed. Reg. 52189. The 2025 Proposed Rule further went on to assert "that the current and/or past receipt of any means-tested public benefit is a key gauge in determining an alien's likelihood of dependence on the government and therefore to determining whether an alien is inadmissible" under the public charge ground. *Id.*

88. The 2025 NPRM provided only a 30-day comment period, requiring all comments to be submitted on or by December 19, 2025. *Id*. at 52168.

89. Given the complexity and seriousness of the changes proposed in the 2025 Proposed Rule, on November 25, 2025, a group of States (including many Plaintiff States)

[2] Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," is an executive order issued in February 2025 that, inter alia, requires each executive agency to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law." 90 Fed. Reg. 10581 (Feb. 19, 2025).

submitted a letter to DHS and USCIS requesting reconsideration of the truncated comment period. *See* Ex. B (Nov. 25, 2025 Letter from Attorneys General to DHS and USCIS (the "Extension Request")). In the Extension Request, the States stated that a shortened comment period of only 30 days was, at the outset, an unexplained departure from the standard 60-day comment period—and that it was furthermore problematic because the short period spanned a major national holiday week. *See* Ex. B at 2; *see also* Executive Order 13563 (Improving Regulation and Regulatory Review, 76 Fed. Reg. 3821; Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, *with a comment period that should generally be at least 60 days*." (emphasis added)). The Extension Request further expressed that a proposed rule of this complexity, in fact, merited an expanded comment period beyond the standard 60 days. Ex. B at 2.

90. DHS and USCIS did not respond to the Extension Request and did not extend the comment period for the 2025 Proposed Rule.

91. Accordingly, on December 19, 2025, the same group of States (again, including many Plaintiff States) submitted a comment letter concerning the 2025 Proposed Rule. *See* Ex. C (Dec. 19, 2025 letter from Attorneys General to DHS and USCIS (the "Comment Letter")).

92. The Comment Letter, drafted against a truncated comment period deadline, raised several grave and fundamental infirmities of the 2025 Proposed Rule and requested its withdrawal. Among other things, the Comment Letter explained the extreme ambiguities that would be caused by the recission of the 2022 Final Rule. *Id*. at 9-16.

93. These ambiguities included, but were not limited to, the 2025 Proposed Rule's departure from the settled meaning of "public charge" as affirmed by multiple appellate courts, as well as the removal of clear structure around how benefits would be considered by immigration

officers, and the lack of consideration or explanation of how the use of benefits in a mixed-status household, *i.e*., a household with citizen and noncitizen members, would be considered. *Id.*

94. The Comment Letter explained how the 2025 Proposed Rule would create foreseeable chilling effects on benefits usage by citizens and noncitizens. *Id*. at 17-21. The 2025 Proposed Rule itself conceded that it would cause widespread disenrollment from public benefits, with DHS estimating disenrollment from benefits at a range from 3.3% to an average disenrollment rate of 17.3%. 90 Fed. Reg. at 52209. And while the 2025 Proposed Rule stated that "DHS welcomes public comments on the estimation of the disenrollment or forgone enrollment rate used in this analysis," it was not clear how the public would be able to conduct such a complex and detailed analysis such as this one within the truncated 30-day comment period. *Id*.

95. In the Comment Letter, Plaintiff States explained how they would also experience a range of downstream costs directly stemming from the changes in the 2025 Proposed Rule. Ex. C at 21-24. For example, in addition to the loss of federal Medicaid funding, Plaintiff States and providers therein would foreseeably need to absorb the associated costs of increased and uncompensated emergency healthcare, increased food insecurity, and others. The Comment Letter explained that the 2025 Proposed Rule did not include an adequate consideration of these increased costs to Plaintiff States.

96. The Comment Letter also noted the 2025 Proposed Rule would subject Plaintiff States to costly administrative burdens associated with increased screening, documentation, and counseling needs for affected families. *Id.* at 21-24.

97. The Comment Letter raised these and other foundational concerns about the 2025 Proposed Rule, with the request that the 2025 Proposed Rule be withdrawn.

**C. The 2026 Final Rule and 2026 USCIS Guidance**

98. In July 2026, DHS and USCIS published the Final Rule regarding the public charge ground of inadmissibility in the Federal Register. Public Charge Ground of Inadmissibility, 91 Fed. Reg. 45324 (Jul. 20, 2026). The Final Rule's effective date was, and remains, 60 days from its issuance, or September 18, 2026.

99. The Final Rule was consistent with the NPRM, and Defendants "issu[ed] th[e] final rule as proposed." *Id*. at 45326. The Final Rule rescinded 8 C.F.R. §§ 212.20, 212.21, 212.22, and 212.23, and amended 8 C.F.R. § 103.6(c). *Id*. at 45325-26.

100. The Final Rule stated that "DHS does not believe that . . . a bright line primary dependence on the government for subsistence standard, as was done in the 2022 Final Rule, is the best implementation of the public charge inadmissibility statute given Congress's clear statement in PRWORA that aliens should be self-sufficient and not depend on public resources." 91 Fed. Reg. at 45407. The Final Rule accordingly announced that "DHS is moving away from a bright line primary dependence standard." *Id*. at 45325.

101. In response to comments that the 2025 Proposed Rule was contrary to law and arbitrary and capricious because it diverged from the well-settled meaning of "public charge," DHS made clear its erroneous position that "there has never been a single, uniform, or 'well settled' definition of public charge" and asserted that the Final Rule was not contrary to such a definition "because no such settled meaning exists." *Id*. at 45340.

102. The Final Rule authorized DHS immigration officers to consider "whether an alien has applied for, been approved or certified for, received, or will likely receive means-tested public benefits." *Id*. at 45380. DHS asserted that "[s]uch information is clearly relevant to whether an alien may lack self-sufficiency by being unable to meet basic living needs." *Id.* DHS declined to

exclude from consideration "any means-tested public benefits related to public health, prenatal care, other health-related issues, or workforce development" or "non-cash means-tested public benefits." *Id*. at 45388. DHS made clear that all means-tested public benefits, whether "fully or partially funded or administered" by the Federal, State, Tribal, territorial, or local government, will all be considered under the Final Rule. 91 Fed. Reg. 45348; *see also id*. at 45343, 45394.

103. The Final Rule did not provide for any "specific weight" that officers will apply to "any particular factor[,]" *Id.* at 45371, and indicated that DHS is not "designating any factors to be more heavily weighted than others in a public charge inadmissibility determination." *Id.* at 45404.

104. In response to comments that the 2025 Proposed Rule lacked sufficient explanation, DHS pointed repeatedly to its goal of removing obstacles that "straitjacket[ed] DHS officers' ability to make public charge inadmissibility determinations that are consistent with Congress's express national policy on welfare and immigration enacted in the PRWORA." 91 Fed. Reg. 45340-41. Specifically, DHS represented that the Final Rule was "rationally related to that PRWORA interest to: (1) minimize the incentive for aliens to immigrate to the United States due to the availability of public benefits; and (2) promote the self-sufficiency of aliens within the United States." *Id*. at 45375 (citing 8 U.S.C. § 1601).

105. The Final Rule noted that it would apply to applications for adjustment of status and admission submitted on or after the effective date of September 18, 2026. *Id*. at 45324, 45326. DHS further stated it "will only consider the receipt of public cash assistance for income maintenance and long-term institutionalization at government expense before the effective date of this final rule and will consider the receipt of any means-tested public benefits on or after that date." *Id.* at 45326.

106. The Final Rule recognized that individuals, including U.S. citizens who are members of mixed-status households, may choose to disenroll or forgo future enrollment in public benefits programs as a result of the Final Rule, and that such decreases in enrollment "may have downstream and upstream impacts on State and local economies[.]" *Id.*

107. In the Final Rule, Defendants represented that "USCIS will issue nonbinding subregulatory guidance that will go into effect on the effective date of this final rule. This guidance will be a general statement of policy that will not have the force and effect of law and will thus be exempt from notice and comment rulemaking." *Id.* at 45338.

108. In response to comments that the Final Rule does not provide sufficient guidance to the public on how DHS will make public charge determinations, DHS pointed to its then-forthcoming guidance, which DHS represented "will explain how officers, under this final rule, will be able to consider the alien's receipt of any means-tested public benefits[.]" 91 Fed. Reg. 45344.

109. On August 18, 2026, almost a month after the Final Rule was published and one month before its effective date, Defendants published the Guidance. *See* Ex. A. The Guidance "stems from the recission of the Public Charge Ground of Inadmissibility ('2022 Final Rule')." *Id.* at 1. The Guidance states that it "is intended to inform, but not prescribe, the outcome of USCIS officers' individual public charge inadmissibility determinations made in their discretion." *Id*. at 9.

110. The accompanying Policy Alert states that the Guidance "contained in the Policy Manual is controlling and supersedes any related prior guidance, including the 1999 Interim Field Guidance and any related guidance addressing public charge inadmissibility," *id.* at 1, and the policy contained in the Guidance "is effective on September 18, 2026." *Id*. at 4. Nothing in the Guidance or its preceding Policy Alert states or suggests that the policies and practices therein are

tentative or non-final. Like the Final Rule, the Guidance delineates an indisputable change in Defendants' policies concerning public charge inadmissibility determinations from which legal consequences will flow, both in rejecting the core meaning of the term "public charge" and in newly requiring that immigration officers consider the use of any means-tested public benefits when making their determinations. For example, the Guidance states that whether an applicant is likely to become a "public charge" is "typically demonstrated through dependence on means-tested public benefits." Ex. A at 13. The Guidance further states that current or past receipt of means-tested public benefits "will almost always be highly relevant" to determining whether an applicant is likely to become a "public charge," *id.* at 27, and that an application for or receipt of means tested public benefits is "highly relevant" to the public charge determination. *Id*. at 59.

111. The Policy Alert, in a subsection entitled "Additional Considerations: Administrative Procedure Act (APA)," provides that "this revised guidance stems from the rescission of the 2022 Final Rule" and states that "USCIS does not believe that the regulated public has significant reliance interests related to the previous iteration of the public charge ground of inadmissibility guidance that are separate from the reliance interests DHS already addressed at length in the 2026 Final Rule[] and that are related to the rescinded regulatory framework contained in the 2022 Final Rule." *Id*. at 3. The Guidance indicates that it "is intended to faithfully implement INA 212(a)(4)[.]" *Id*. at 8.

112. The Guidance repeats the Final Rule's erroneous premise that "there is no judicially established or uniformly consistent historical understanding of the term public charge." *Id*. at 13.

113. The Guidance, together with the Final Rule, confer unprecedented, unqualified discretion on immigration officers, as long as the officers' findings are made in the "totality of the circumstances."

**1. The Final Rule is contrary to law and exceeds Defendants' statutory authority.**

114. The Final Rule's recission of 8 C.F.R. § 212.21(a), a regulation which codified the long-standing meaning of "public charge" to refer to a noncitizen who is "likely at any time to become primarily dependent on the government for subsistence," is premised on Defendants' erroneous interpretations of the public charge statute. The Final Rule is contrary to law.

115. The Final Rule is premised on an interpretation of the public charge statute that abandons its core settled meaning of what makes someone a "public charge," which has existed for over a century and was incorporated by Congress into the INA. Defendants' stark departure from the statute's settled meaning is made plain in the Final Rule and the accompanying Guidance alike. For example, in discussing the recission of the 2022 Rule's codification of the long-standing meaning of "public charge," the 2026 Final Rule states that "there has never been" a "'well-settled' definition of public charge." 91 Fed. Reg. 45340. The 2026 Final Rule further states, repeatedly, that "DHS is moving away from a bright line primary dependence standard." *See, e.g.*, *id*. at 45325; *see also id.* at 45393 ("DHS is eliminating the primary dependence standard"); Guidance at 13 ("[T]here is no judicially established or uniformly consistent historical understanding of the term public charge.").

116. But this fundamental premise of the Final Rule is wrong. As the Second Circuit has held, "[t]he prevailing administrative and judicial interpretation of 'public charge' ratified by Congress understood the term to mean a non-citizen who cannot support himself, in the sense that he is incapable of earning a livelihood, does not have sufficient funds in the United States for his support, and has no person in the United States willing and able to assure that he will not need public support." *New York*, 969 F.3d at 74–75 (cleaned up) (internal quotations and citations omitted). In other words, "[t]he settled meaning of 'public charge,' as the plain meaning of the term already suggests, is dependency: being a persistent 'charge' on the public purse . . . [T]he

mere receipt of benefits from the government does not constitute such dependency." *Id.* at 74. Indeed, as discussed *supra* ¶¶ 59 and 60, Congress specifically rejected proposed legislation to alter and broaden the longstanding meaning of "public charge."

117. Having abandoned Congress's core meaning of the term "public charge" to mean an individual incapable of earning a livelihood, the Final Rule purports to accomplish by regulation what Congress declined to legislate—it significantly expands the meaning of the term "public charge" to include use of *any means-tested public benefits*, including even minimal use of supplemental benefits designed by Congress to promote health, nutrition, and general well-being.

118. Throughout the Final Rule and Guidance, Defendants invoke PRWORA as a justification for their abandonment of the settled core meaning of "public charge." Again and again, Defendants rely on general policy statements in PRWORA, such as the general statement that noncitizens "should be self-sufficient and not depend on public resources." *See, e.g.*, 91 Fed. Reg. 45331, 45337, 45368, 45379, 45407; *see also* Ex. A at 5. Under Defendants' interpretation, Congress's general policy statement in PRWORA "that 'aliens. . . not depend on public resources to meet their needs'" means that "receipt of *any* means-tested public benefit *irrespective of the time frame*" is evidence that an applicant is likely to "become a public charge." Ex. A at 10 (emphases added). Indeed, further confirming that the Final Rule now equates the meaning of "public charge" with dependency on any means-tested benefits, the Guidance states "officers must determine whether an alien is likely *at any time* to become a public charge, *that is, likely at any time to depend on means-tested public benefits*." *Id*. at 13 (second emphasis added).

119. Defendants' view that Congress drastically changed the meaning of "public charge" in 1996 is wrong, contrary to law, and exceeds Defendants' statutory authority. PRWORA did not change the INA's provision on the meaning of "public charge," which was amended by IIRIRA,

but *not* PRWORA. PRWORA could not have altered the meaning of the term to mean reliance on any means-tested benefit. Moreover, Congress fully addressed PRWORA's general policy statements about self-sufficiency and immigrants' access to benefits by instituting through PRWORA a complex system that limited certain non-citizens' eligibility for certain means-tested benefits, while allowing other non-citizens to continue to obtain those benefits. As the Second Circuit explained, "PRWORA implemented Congress's goal of self-sufficiency by *restricting* non-citizen eligibility for benefits, including the establishment of the five-year waiting period for LPRs." *New York*, 969 F.3d at 77 (emphasis in original). PRWORA does not "indicate any congressional intention that non-citizens who receive benefits for which Congress did *not* render them ineligible" should be considered "'public charges.'" *Id.* (emphasis in original).

120. The Final Rule allows immigration officers to make public charge determinations in ways that plainly contravene the statute's core settled meaning. The Final Rule gives immigration officers "discretion" to re-define the term "public charge" to mean whatever an officer thinks it may mean—as long as they recite that they have made that determination in the "totality of the circumstances." Indeed, the Final Rule acknowledges that it "does not limit officer discretion." 91 Fed. Reg. at 45348.

121. The Final Rule and the Guidance provide little indication of the acceptable outer bounds of what Defendants believe could lawfully support a public charge inadmissibility determination. *Id.* at 45343. For example, the Final Rule indicates that "officers will be able to consider whether the alien: received means-tested public benefits for only a short period of time, received small dollar amounts of assistance, received any particular public benefit rendering the alien dependent on the benefit, received means-tested public benefits permanently or temporarily, and has good overall prospects for being and remaining self-sufficient." *Id*. However, neither the

Final Rule nor the Guidance provides any indication as to what constitutes a "short period of time," "small dollar amounts of assistance," "dependen[ce] on [a] benefit," "temporar[y]" use of a benefit, or "overall good prospects for being and remaining self-sufficient" such that officers make consistent, non-arbitrary determinations across applications with similar facts.

122. This unqualified discretion opens the door to outcomes that are not contemplated by Congress and are contrary to law—the impact of which may be particularly dire given that noncitizens have limited rights to appeal public charge inadmissibility determinations. 91 Fed. Reg. at 45358 and n.151; 8 C.F.R. § 245.2(a)(5)(ii) (2011).

123. For example, the Final Rule provides that use of supplemental benefits, *i.e.*, benefits that Congress designed to promote health and well-being rather than to provide basic subsistence, should be treated the same in public charge determinations as use of cash assistance designed to provide basic subsistence. As the Final Rule states, "DHS is not drawing distinctions between public benefits based on whether they merely subsidize an alien's life or provide for the alien's basic needs." *Id*. at 45343. But drawing such distinctions is critical to any reasonable interpretation of the term "public charge," which means "a person who is unable to support herself, either through work, savings, or family ties." *New York*, 969 F.3d at 71. Supplemental benefits—for example, SNAP and Medicaid benefits—are distinguishable from cash benefits in multiple respects that bear on whether a person is in fact a "public charge." "[T]hese programs are designed to provide supplemental support, rather than subsistence, to a broad swath of the population[.]" *Id.* at 84. Supplemental benefits are used by people across a range of means, including working people who are able to provide for their needs, and who earn salaries above federal poverty guidelines including, in some cases, above the 125% affidavit of support threshold. *Id.* ("Large numbers of SNAP recipients, far from being incapable of productive employment, work for some of America's

largest corporations."). Congress designed these supplemental benefits to be available to working people, and not only those who face dire financial constraints and therefore must rely on the government for subsistence.

124. The Final Rule even allows immigration officers to consider the use of supplemental benefits by a *U.S. citizen family member* whom the noncitizen is "legally obligated to support" when determining if the noncitizen is likely at any time to become a "public charge." 91 Fed. Reg. at 45350; *see also id.* at 45355, 45365–66. This allows the use of supplemental benefits by a U.S. citizen child to be counted to the same degree as a noncitizen's use of cash assistance benefits, even though Congress made the choice to make supplemental benefits broadly available to citizens—particularly citizen children—to uplift nutrition, health, and well-being rather than to provide for basic subsistence.

125. The Final Rule provides that "DHS would … consider the … child's receipt of means-tested public benefits under this final rule if the alien is legally obligated to support the child and the child's receipt of the means-tested public benefits is based on the alien's income falling below the designated threshold." 91 Fed. Reg. at 45390. But nearly every means-tested public benefit that a citizen child might apply for—including supplemental benefits like, for example, nutrition benefits under the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") or healthcare benefits under the Children's Health Insurance Program ("CHIP")—considers the parents' or household's income as an eligibility requirement. 7 C.F.R. § 246.7(d) (2024) (WIC regulation governing income criteria and income eligibility determinations). This is rational; children, generally, have no income. But under the Final Rule and the Guidance, a U.S. citizen child's use of the supplemental benefits to which they are entitled

will be considered negatively against a noncitizen parent who is subject to a public charge inadmissibility determination.

126. In providing access to supplemental benefits programs such as CHIP to citizen children, Congress made a reasoned judgment that young citizens' access to adequate nutrition and healthcare is in the national interest. And, as with certain other supplemental benefits, income thresholds to qualify for CHIP exceed federal poverty guidelines, and in some cases exceed the 125% affidavit of support threshold, demonstrating that children enrolled in these programs can come from families with working parents who are able to provide for their households and are not dependent on the government.

127. The Guidance even specifies that "financial aid for postsecondary education … provided to an individual, household, or family eligibility unit" can be considered in a public charge inadmissibility determination. Ex. A at 14. Considering that an *overwhelming* majority of first-time undergraduates attending 4-year public institutions receive financial aid (85.1% for the 2023-24 school year), any throughline from a noncitizen's child taking on student loans to defray educational costs, to a conclusion that that noncitizen is "dependent" on the government is attenuated at best. *See, e.g.* Nat'l Ctr. for Educ. Statistics, *Integrated Postsecondary Education System*, https://nces.ed.gov/ipeds/trendgenerator/app/build-table/8/34?f=2%3D1&rid=1&cid=51 [https://perma.cc/4N2D-C45L] (last visited Sept. 14, 2026).

128. Defendants do not deny the Final Rule's negative effects on children, including citizen children. To the contrary, the Final Rule admits that DHS "assessed the rule's effect on children and determined that the rule may negatively impact the health and education opportunities for children, including U.S. citizen children." 91 Fed. Reg. at 45364.

129. Moreover, by "not drawing distinctions" between supplemental and other benefits, the 2026 Final Rule authorizes immigration officers to make unlawful public charge determinations that are the same as public charge determinations authorized by the 2019 Rule, which the Second Circuit concluded would be contrary to law. Like the 2019 Rule, the 2026 Final Rule enables Defendants to make a noncitizen's receipt of supplemental non-cash benefits, including a citizen child's use of supplemental benefits to which they are statutorily entitled, however minimal or however long ago, indicative of being inadmissible as a "public charge." The Guidance also supports such unlawful determinations, providing that "any current or past receipt of means-tested public benefits[] by the alien will almost always be highly relevant to assessing an alien's likelihood at any time of becoming a public charge." Ex. A at 27.

130. The Final Rule and Guidance are unclear as to whether they enable officers to consider public benefits that are not means-tested at all, and that are instead universally available within a certain school, school district, or other jurisdiction. For example, the Final Rule states that "officers could take into consideration whether an alien participated in a school lunch or summer food program by virtue of a *school's* certification and availability of meals to *all students*." 91 Fed. Reg. at 45399 (emphases added). The Guidance, however, implies that DHS officers will only consider "means-tested" benefits, which it describes as a benefit for which eligibility is "determined based on the applicant's income or assets falling below a certain threshold." Ex. A at 14. To the extent that the regime established by the Final Rule and the Guidance does allow officers to consider universal benefits that are not means-tested, this is contrary to law.

131. For example, within Plaintiff States, certain schools and school districts are enrollees in the USDA's Community Eligibility Program ("CEP"). Under this program, qualifying schools or school districts receive reimbursement for providing free breakfast and lunch to

children, and schools or school districts qualify for CEP based on the percentage of students in those schools or districts who are enrolled in other means-tested benefits, such as SNAP or TANF. *See, e.g.*, U.S. Dep't of Agric., *Community Eligibility Provision*, (last updated March 17, 2026), https://www.fna.usda.gov/cn/cep [https://perma.cc/7GLW-GE8B]. Within certain Plaintiff States, some municipalities, such as New York City and Chicago, are enrolled in CEP on a citywide basis, meaning that all children attending public schools in these cities have access to free school breakfast and lunch, irrespective of their or their household's means. Moreover, some Plaintiff States, including New York and California, also have universal school meal programs that all public school students can access ("universal school lunch states"). Public school students of all means participate in these programs, and all students can receive free meals without affirmatively signing up for the program.

132. If the Final Rule enables officers to consider accessing universally available benefits (such as school lunch in a CEP school or in a universal school lunch state), which are not means-tested and have no connection with any of the statutory factors set forth in the INA, this is contrary to law.

133. The fundamental flaws in the Final Rule are further heightened by Defendants' "declin[ing] to attach specific weight to any particular factor because the public charge inadmissibility determination is a subjective, discretionary, and case-specific determination." 91 Fed. Reg. at 45371. And the Guidance sheds no further light as to what standards officers would apply to ensure that similar fact patterns result in similar determinations. This lack of standards allows individual immigration officers to recast the meaning of "public charge" in ways that are contrary to law. As just one example, an immigration officer could decide that a noncitizen's temporary use of supplemental benefits to weather a setback three years prior to adjusting status,

or a noncitizen's teenaged citizen child submitting a FAFSA application, is just as indicative of being a "public charge" as a noncitizen's consistent reliance on cash benefits over the course of multiple years.

134. This regime allows for the possibility that a healthy, working individual may be deemed inadmissible as a "public charge" merely based on a constellation of facts that do not demonstrate a primary dependence on public benefits, or a lack of self-sufficiency, at all: for example, their household's one-time access of SNAP benefits to defray costly grocery expenses, the universal availability of free lunch at their child's elementary school, or their teenager's application for financial aid for college. Under the Final Rule, immigration officers have discretion to attribute any weight to any attenuated piece of information—whether benefits-related or other—and to thereby deem a noncitizen to be a "public charge."

135. Although the Final Rule indicates that evidence would be considered in the totality of the circumstances, the mere recitation of this phrase is not sufficient to demonstrate that the Final Rule is consistent with the statute.

136. While some discretion for immigration agents is proper, that discretion cannot be stretched to allow immigration officers to construe the use of means-tested public benefits in a manner that is inconsistent with the established meaning of "public charge," including by considering benefits that bear no rational relationship to whether a person is likely to become a "public charge" at all. The Final Rule's "totality of the circumstances" standard cannot lawfully be so broad that it is inconsistent with the statute itself, and inconsistent with the settled meaning of the term "public charge."

137. Defendant Mullin is "charged with the administration and enforcement" of the INA and "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

Defendant Mullin is also authorized to adopt regulations as needed in his administration and enforcement of the INA. *Id.* § 1103(a)(3). But no provision of the INA authorizes Defendant Mullin, or any other Defendants, to adopt regulations, rules, guidance, or practices to define or use "public charge" in a manner that is inconsistent with the settled meaning of that term, as ratified by Congress. In now adopting such rule and guidance, Defendants have exceeded their statutory authority.

**2. The Final Rule is arbitrary and capricious.**

**a. Defendants' explanations rest on erroneous legal and factual conclusions.**

138. In abandoning the settled meaning of "public charge," and abandoning almost all limits on which benefits immigration officials may consider when deciding whether a noncitizen is likely at any time to become a "public charge," *see* 91 Fed. Reg. 45393 ("all benefits received have bearing on whether an alien is likely at any time to become a public charge"), Defendants rely on a number of unsupported and faulty conclusions.

139. Defendants repeatedly rely on what they describe as "'the spirit of the broad statutory text in section 212(a)(4) of the INA,'" claiming that the 2022 Final Rule (as well as the 1999 Guidance and even the 2019 Rule promulgated by the first Trump administration) are inconsistent with this provision. *See, e.g.*, 91 Fed. Reg. 45361. Section 212(a)(4)(A) states that immigration officers "shall at a minimum consider the [applicant's] (i) age, (ii) health, (iii) family status, (iv) assets, resources, and financial status, and (v) education and skills." 8 U.S.C. § 1182(a)(4)(B). Defendants assert that the "at a minimum" language indicates that "Congress clearly intended officers to consider case-specific additional factors and information relevant to the public charge inadmissibility determination." 91 Fed. Reg. 45353.

140. Defendants fail to provide a reasoned explanation as to why the "at a minimum" language is best read to mean that agents should be able to consider virtually *any* degree of benefits use, at *any* time, and for *any* duration. And Defendants never argue that the INA prevents the agency from excluding categories of evidence for which the probative value, if any, would be outweighed by harms such as chilling effects, as DHS did in the 1999 Guidance, the 2019 Rule, and the 2022 Rule. Relying on the "at a minimum" language that has been part of the INA since 1996 to avoid weighing the Final Rule's costs, and to refuse to consider alternatives that could mitigate some of those costs, is not reasonable.

141. Defendants also repeatedly invoke what they describe as Congress's "national policy" set forth in PRWORA. *See, e.g.*, 91 Fed. Reg. 45361 (summarily dismissing the Final Rule's chilling effects by asserting that "our national policy . . . as set forth in PRWORA [is] a sufficient basis to move forward with this final rule").

142. PRWORA's prefatory statement is not an adequate basis for dismissing all consequences of and harms caused by Defendants' decision to consider any means-tested public benefits in public charge determinations. While PRWORA restricted immigrant eligibility for some benefits, it expressly preserved access to many others, both in 1996 and in subsequent years. As the Second Circuit found, "Clearly, Congress decided that the benefits it preserved for non-citizens after PRWORA did not interfere with its interest in assuring non-citizen self-sufficiency." *New York*, 969 F.3d at 77. Further, it was IIRIRA, not PRWORA, that amended the public charge provisions in the INA. Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674-75 (1996). Defendants cannot rely on PRWORA as an excuse for failing to engage in reasoned decision-making required by the APA.

143. Defendants also explain their decision to disregard the Final Rule's negative impacts on access to public benefit programs by repeatedly noting that the Final Rule itself does not alter eligibility for those programs. *See, e.g.*, 91 Fed. Reg. 45362 (dismissing concerns that the Final Rule will discourage enrollment of eligible individuals because "the rule does not change eligibility requirements"). To be sure, Defendants lack statutory authority to alter eligibility rules for public benefit programs they do not administer. But this disclaimer fails to grapple with the fact that attaching new, severe negative consequences that deter participation in public programs frustrates and is contrary to Congress's and the States' purposes in enacting those programs.

144. As with Medicaid and SNAP, the "goals and eligibility criteria of these benefits programs […] show that these programs are designed to provide supplemental support, rather than subsistence, to a broad swath of the population." *New York*, 969 F.3d at 83–84.

145. Many public benefit programs are purposefully designed to incentivize all eligible individuals and families to participate. To achieve that purpose, these programs are premised on well-established immigration law, which does not penalize participation. For example, the Emergency Medical Treatment and Labor Act ("EMTALA") requires hospitals to provide emergency medical treatment, including in labor and delivery, to any patient needing such care, irrespective of that person's ability to pay or their immigration status. 42 U.S.C. § 1395dd. The Medicaid Act provides states with funding for this emergency treatment, so long as the patient agrees to accept Emergency Medicaid coverage. 42 U.S.C. § 1396b(v)(2).

146. Defendants acknowledge that the Final Rule will lead to "increased use of emergency rooms . . . and increased rates of uncompensated care, where treatments or services are not paid for," and nonetheless decline to exempt emergency Medicaid coverage from consideration. 91 Fed. Reg. 45418-19.

147. The Final Rule never even mentions EMTALA, and Defendants fail to explain why Congress's important policy goals in EMTALA and Emergency Medicaid should be sacrificed just to give immigration officers more discretion.

148. Defendants similarly fail to consider the specific policy goals of many other statutes authorizing public programs in which Congress or the states decided public benefits should be broadly accessible to those in need, resulting in "an agency justification that is unmoored from the nuanced views of Congress." *New York*, 969 F.3d at 82. This is not reasoned decision-making.

**b. By removing virtually all limits on what officers can consider as part of public charge inadmissibility determinations, the Final Rule departs from decades of prior policies.**

149. The Final Rule rescinds all prior regulatory limits on the amount, duration, and type of public benefits that immigration officers may consider when deciding who is inadmissible on public charge grounds. *See, e.g.*, 8 C.F.R. §§ 212.21(a)-(d), 212.22(d)-(e) (2022) (limiting types of public benefits considered as part of the totality of the circumstances test; prohibiting consideration of benefits received while a citizen was in an exempt category; and prohibiting consideration of receipt of benefits available to refugees). Instead, officers will be allowed to "consider *any and all public benefits* funded by the government for which eligibility is determined by assessing whether the alien's means are below the specified level." 91 Fed. Reg. 45437 (emphasis added); *id*. at 45387.

150. The Final Rule's removal of all regulatory limitations on the consideration of public benefits is a dramatic departure from all prior DHS policies.

151. The Final Rule is a particularly stark departure from the well-established limits set forth in the 1999 Field Guidance and codified in the 2022 Rule, which ensured that only those public benefits that are directly relevant to the question of primary dependence—namely, cash benefits for income maintenance and institutionalization at government expense—would be

counted against an applicant for admission, while "non-cash" or "supplemental" benefits, like nutrition assistance and regular Medicaid, would not.

152. Even under the short-lived 2019 Rule enacted by the first Trump administration, immigration officers were barred from considering many types of means-tested public benefits, including state-funded benefits, public health benefits, emergency benefits, WIC benefits, CHIP benefits, and more. At that time, Defendants reasoned that these limits were needed in order to "mitigate some of the concerns raised by the public regarding disenrollment impacts." 84 Fed. Reg. 41313.

153. Defendants' across-the-board rescission of all prior limitations on which public benefits officers may consider is neither "reasonable [nor] reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

**c. Defendants' analysis fails to consider important aspects of the problem and reliance interests.**

154. Defendants acknowledge abundant evidence of serious harm in the Final Rule but brush off those harms with repetitive and faulty legal reasoning and generic, unsupported factual statements. In so doing, Defendants fail to consider many important aspects of the many problems raised by the Final Rule.

155. Over and over, Defendants fail to assess whether receiving certain types of benefits actually has probative value in determining whether a particular person will become a "public charge." Defendants fail to compare that value (if any) to the acknowledged harms of allowing immigration officers to consider those types of benefits. Defendants also fail to consider options to mitigate specific harms by excluding particular public benefits from consideration based on amount, duration, or type of benefit. Defendants' cursory analysis is particularly deficient in light of the Final Rule's departure from prior policies, which have engendered serious reliance interests

that the agency should have taken into account when promulgating the Final Rule and Guidance, but did not.

156. Defendants' failure to engage in reasoned evaluation of alternatives which would have narrowed the evidence immigration officers may consider falls into at least seven broad buckets.

157. First, Defendants failed to consider the specific harms of considering receipt of benefits that are limited in duration or supplemental in nature or amount and that promote the Final Rule's purported goal of ensuring that immigrants are self-sufficient. As many of the Plaintiff States explained in the Comment Letter, and as Defendants themselves acknowledged in 2022, supplemental benefits like subsidized health insurance or supplemental nutrition assistance are available "to families with incomes far above the poverty level," and promote "upward mobility, rather than long term subsistence." Ex. C at 5 (citing 2022 Rule). Defendants' only response is an across-the-board assertion that receipt of any means tested benefit is "clearly relevant to whether an alien may lack self-sufficiency." 91 Fed. Reg. 45380. But Defendants never provide any factual basis for that belief. And they ignore that in the United States, "access to insurance is often determined by factors beyond an individual's control." *New York*, 969 F.3d at 84. This is not reasoned decision-making.

158. Second, Defendants failed to weigh the harms of discouraging participation in public programs designed by Congress or the states to promote public health, welfare, and safety, and to strengthen families and communities. Such programs include school lunch and nutrition programs, the WIC program, publicly funded vaccination campaigns, CHIP and prenatal healthcare, Head Start, early intervention programs, and more.

159. When individuals avoid preventive care and treatment available through publicly funded healthcare services—such as breast and cervical cancer screening, or long-acting reversible contraception—the costs are enormous. The Final Rule will increase an individual's risk of late-stage disease detection, unintended pregnancy, poor birth outcomes and increased morbidity and mortality for late-stage disease.

160. Federal and state lawmakers intended such programs to reach all eligible individuals because of their long-term beneficial effects, for both recipients and communities. Defendants acknowledge that the Final Rule will reduce enrollment in these programs, which will cause harms such as worse birth outcomes for babies, more malnutrition (especially among pregnant and breastfeeding women, infants, and children), and worsening "health outcomes and mortality," including "approximately 3,500 additional premature deaths per year." 91 Fed. Reg. 45430. Yet Defendants attempt to disavow any obligation to meaningfully consider these consequences, by instead reiterating that the Final Rule does not change eligibility for these benefits. *Id*. This faulty and callous reasoning fails to grapple with those programs' statutory purposes and the real-world impacts of the Final Rule that Defendants themselves acknowledge. Defendants do not deny the Final Rule's negative effects on children, including citizen children. *See, e.g.,* 91 Fed. Reg. at 45364 (DHS "assessed the rule's effect on children and determined that the rule may negatively impact the health and education opportunities for children, including U.S. citizen children.").

161. Third, Defendants failed to weigh the significant public safety and public health problems that will arise when noncitizens are forced to weigh use of emergency life-saving care for themselves, their children, or their pregnancies, versus the extraordinarily limited probative value of receipt of emergency services. Defendants' only explanation regarding inclusion of receipt

of emergency healthcare services is that "Congress mandated aliens to be self-sufficient and not depend on public resources to meet their needs." 91 Fed. Reg. 45388. Defendants' reliance on PRWORA throughout the Final Rule for the theory that Congress sought self-sufficiency of noncitizens fails to justify DHS's refusal to exclude emergency services from consideration; indeed, Congress specifically *exempted* emergency services from PRWORA's noncitizen eligibility restrictions.

162. Fourth, Defendants failed to weigh the harms of consideration of public benefits that Congress or the states make available to individuals and families with a broad range of income levels, or that are universally available, versus the extraordinarily limited probative value of receipt of such benefits. For example, subsidies for purchase of marketplace plans under the Affordable Care Act (the "ACA") are available to households earning up to 400% of the Federal Poverty Level, well above the 125% affidavit of support threshold, and additional cost-sharing reductions are available to marketplace enrollees with incomes up to 250% of the Federal Poverty Level. 42 U.S.C. § 18071. Medicare and Medicaid often offer working people with disabilities, whose earnings may exceed traditional Medicaid limits, the option to receive needed assistance while being self-supporting. School lunch programs in some Plaintiff States (and in some sub-jurisdictions within them) are available to all school children, regardless of income and with no affirmative application required. And there is no income cut-off to apply for federal student financial aid for postsecondary school. *See, e.g., Financial Aid Eligibility*, Fed. Student Aid, https://studentaid.gov/understand-aid/eligibility [https://perma.cc/BB6R-7Z9K] (last visited on Sept. 14, 2026).

163. Defendants fail to weigh the limited probative value of considering the receipt of such broadly available benefits, or to consider the purposes or Congress's statutory intent or goals

for these programs, instead only considering one iteration of legislative intent when mechanically relying on PRWORA's "directive that aliens should be self-sufficient." 91 Fed. Reg. 45368. But it "makes little sense to treat" the receipt of benefits intended for a wide range of people earning low to moderate incomes "as proof of inability to survive by one's own efforts." *New York*, 969 F.3d at 84.

164. Fifth, Defendants failed to weigh the especially grave harms of considering participation of noncitizens' U.S. citizen children in public programs for which those children are eligible. The consequences of disenrollment from public health and educational programs are "direct and severe," leading to "under-utilization of primary care and preventative services; reduced vaccination rates; declines in nutritional supports," and more, plus "higher costs and program churn for state health and human services agencies." Ex. C at 20. While Defendants claim to have "taken steps to mitigate the effects of [the Final Rule] on families," 91 Fed. Reg. at 45443, neither the Final Rule nor the Guidance contains any such mitigating provisions. In fact, in the Final Rule's preamble, Defendants double down on officers' right to "consider the parents' legal obligation to support" their children as part of the totality of the circumstances review. *Id*; *see also id*. at 45390. This is not reasoned decision-making.

165. Sixth, Defendants failed to weigh the harms of considering public benefits received while a noncitizen is in an immigration category that is statutorily exempt from the public charge ground (such as refugees and asylees, and their family members). *See* 91 Fed. Reg. 45406-07. In some circumstances, individuals receiving those humanitarian benefits will later apply for admission on a non-exempt basis, such as when a child or former spouse of an asylee applies for adjustment on a different basis. Removal of prohibitions on receipt of benefits for individuals in exempt categories and consideration of benefits available to refugees will interfere with state

programs assisting vulnerable arrivals. This is contrary to Congressional intent, and will make it harder for refugees, asylees, and others similarly situated to agree to receive temporary assistance to stabilize circumstances as recent arrivals and to acclimate to the community. In the 2022 Final Rule, DHS decided to "tailor its rule to limit the effects of certain regulatory provisions on discrete populations," such as refugees and asylees." 87 Fed. Reg. 55475. Defendants fail to justify this turnaround.

166. Seventh, Defendants pay no more than lip service to the reliance interests engendered by individuals' enrollment in public benefit programs that involve longer term periods of enrollment and benefit. For example, if a noncitizen, or their family member, had decided to pursue higher education and took advantage of financial support for which they were eligible, in reliance on well-established rules that prevent immigration officials from later considering that support in public charge determinations, the Final Rule now puts them in an impossible position of choosing to continue a course of study to which they are already committed in order to obtain a degree, and jeopardizing their immigration status. Yet Defendants fail to consider these types of reliance interests. *See* 84 Fed. Reg. 41477 (justifying economic harms caused by forgone financial aid by noncitizens based on "principles of PRWORA").

167. All of these failures are exacerbated by Defendants' decision to truncate the normal sixty-day comment period into a mere thirty days that included a national holiday. *See supra* ¶ 89. Defendants' truncated comment period likely contributed to the fact that many acknowledged harms are not reflected in the Regulatory Impact Analysis due to missing data. *See, e.g.*, 91 Fed. Reg. at 45415 (noting that the agency could do only qualitative analysis of downstream impacts, such as on children and uncompensated care, due to failure to receive comments that would allow quantification of those impacts).

**d. The Final Rule will lead to arbitrary decisionmaking.**

168. Generally, Defendants fail to provide limits or bounds on the evidence that immigration officers can use in public charge determinations, stating that "[o]fficers will be empowered to consider . . . any case-specific evidence that the officer determines is relevant." 91 Fed. Reg. 45392. The Final Rule and Guidance also fail to provide notice to Plaintiff States and to the regulated public regarding how that evidence will be evaluated. The Final Rule therefore provides no intelligible or administrable standard for public charge determinations, and instead grants unfettered discretion immigration officers, which will lead to inconsistent public charge adjudications.

169. These aspects of the Final Rule and Guidance are inconsistent with Defendants' stated objective of "ensur[ing] consistent implementation of the public charge ground of inadmissibility and fair adjudications." 91 Fed. Reg. 45412.

170. Notably, as discussed *supra*, the Final Rule and the Guidance erroneously claim that "there is no judicially established or uniformly consistent historical understanding of the term public charge." *See* Ex. A at 13. Instead, according to the Guidance, USCIS "generally considers" an applicant seeking admission to be likely at any time to become a "public charge" if the applicant is "likely to become dependent on the government to meet his or her basic needs . . . typically demonstrated through dependence on means tested public benefits." *Id.* Despite the apparent centrality of such "means tested public benefits" to the Final Rule's new approach, the Guidance notes that there "is no statutory or regulatory definition of means-tested public benefits for the purpose of public charge inadmissibility determinations" and instead only explains when a "benefit" is "generally considered" to be means-tested. *Id.* at 14. Adding further confusion, the Final Rule states that the use of universally available benefits like, for example, school lunch in

certain jurisdictions, may be considered by immigration officials. 91 Fed. Reg. at 45399 ("[Immigration] officers could take into consideration whether an alien participated in a school lunch or summer food program by virtue of a *school's* certification and availability of meals to *all students."*) (emphasis added). By contrast, the Guidance implies that only benefits "based on the applicant's income or assets falling below a certain threshold" would be considered. Ex. A at 14. Defendants' refusal to provide clear, administrable standards leaves Plaintiff States and the regulated public in the dark about which benefits may be considered in a public charge determination and what weight or significance their use will be given.

171. For further example, the Final Rule says that immigration officers will consider "statistics . . . regarding long-term outcomes for program participants and impacts on health, employment and employability," but does not provide those statistics, their sources, or any explanation as to how an officer would use such statistics. 91 Fed. Reg. 45399. Further, neither the Final Rule nor the Guidance provide any clue as to how a noncitizen could overcome or otherwise address inferences drawn from these undisclosed "statistics." The absence of any concrete guidance or administrable standards regarding how individual immigration officers will weigh information—including statistical information that is presumably not individualized to the noncitizen at all—means that Plaintiff States, and the public at large, must guess about the standards to which applicants for admission will be held. This lack of administrable standards undermines applicants' ability to make informed choices for themselves or their children about the receipt of benefits, and all but ensures that immigration officers facing similar fact patterns will make arbitrary and inconsistent public charge determinations.

172. Defendants claim that any decision by noncitizens to disenroll from or to forgo public benefits on behalf of their U.S. citizen children would be "unreasonable" because "DHS

has communicated" that such receipt "will not be considered except in limited circumstances." 91 Fed. Reg. 45361. However, Defendants also assert that they will consider the receipt of means-tested public benefits by a noncitizen's child if such benefits are "the alien's source of financial support or the alien is legally obligated to support the child who is receiving the means-tested public benefits" by treating the child's receipt of such as benefits as "relevant to the alien's assets, resources, and financial status. . . in the totality of the circumstances." *Id.* at 45350; *see also id.* at 45355, 45366, 45390. In other words, despite their statements to the contrary, Defendants give every indication that a U.S. citizen child's receipt of means-tested public benefits would be weaponized against their noncitizen parent and that disenrollment may be the only "reasonable" shield against such a result. But nothing in the Final Rule or the Guidance explains what those "limited circumstances" are, or how the lawful receipt of public benefits by their U.S. citizen children or other family members will be treated by an immigration official. Plaintiff States and the regulated public are left with no clear information enabling them to make informed choices.

173. Defendants' failure to release adequate explanatory subregulatory guidance at the same time as it released the Final Rule exacerbates harms to reliance interests and also contradicts the Final Rule's claim that it is not retroactive. In many cases, disenrollment from public benefit programs takes time and many public benefits are designed to operate on a year-to-year basis. For example, Medicaid enrollment is typically certified on a yearly basis. Thus, those who wish to disenroll from benefits to avoid immigration consequences (including citizen family members who wish to prevent adverse immigration consequences for their relatives) are unlikely to be able to do so before the Final Rule takes effect. Consideration of receipt of those benefits after the Final Rule's effective date effectively gives it retroactive effect.

### D. The Final Rule will cause harm to Plaintiff States.

#### 1. The Final Rule will create a chilling effect, reducing lawful participation in valuable public programs.

174. As Defendants acknowledge, the Final Rule will have a chilling effect on noncitizens' and their citizen family members' willingness to avail themselves of public benefits. 91 Fed. Reg. 45460.

175. The Final Rule will result in noncitizens withdrawing from or forgoing enrollment in public programs that their tax dollars support, and that provide supplemental benefits to which they are legally entitled. The Final Rule will also chill citizen family members (including children who are citizens) from lawfully using benefits that Congress intended them to use.

176. Moreover, millions of noncitizens—including many of Plaintiff States' residents—are and will continue to be afraid of and confused about the potential consequences of applying for benefits and will forgo public assistance altogether. Defendants recognize the chilling effects of the Final Rule will not be limited to those who are directly subject to public charge determinations, and will also impact lawful permanent residents, refugees, asylees, and U.S. citizens living in mixed-status families who can lawfully access various public benefits. 91 Fed. Reg. 45461; *see also id.* at 45426 ("DHS recognizes decreased participation in public benefit programs may include those not subject to the public charge ground of inadmissibility, such as children in mixed-status households, longtime [lawful permanent residents], and aliens in categories exempt from public charge."). Defendants offer only the cursory and cruel response that any choice to forgo benefits by citizens whose families include noncitizens would be "unreasonable." 91 Fed. Reg. at 45361.

177. The scope of chilling effects will be extensive because the 2026 Rule gives broad, unfettered discretion to immigration officials to consider the receipt of *any* means-tested public

benefits by the noncitizen applying for admission or any family members the noncitizen is "legally obligated to support," 91 Fed. Reg.45400, and fails to limit the consideration of such benefits in any way.

178. Extensive research documents the likelihood of chilling effects caused by perceived expansions of the public charge test. For instance, the Kaiser Family Foundation conducted a study similarly finding that the proposed public charge changes will likely lead to decreased participation in public programs, including Medicaid and CHIP, among immigrant families, including U.S. citizen children in those families.[3]

179. Moreover, history confirms the likelihood of substantial chilling effects. The 1996 changes in law caused widespread confusion and fear, resulting in significant chilling effects, and many immigrants disenrolled from or declined to apply for public benefits for which they were legally eligible under federal and state law.

180. The post-1996 disenrollment rates ranged between 15 percent and 35 percent for all noncitizen immigrants and children in families with mixed immigration status. Chilling effects for refugees have historically been even higher—with up to 60 percent disenrollment found in some cases, even though refugees are exempt from the public charge ground of inadmissibility and have been generally exempted from restrictions on access to benefits.

181. The federal government issued the 1999 Field Guidance in order to "help alleviate public confusion over the meaning of the term 'public charge' in immigration law and its relationship to the receipt of Federal, State, and local public benefits" and to provide noncitizens "with better guidance as to the types of public benefits that will and will not be considered in public

[3] Samantha Artiga et al., *Potential "Chilling Effects" of Public Charge and Other Immigration Policies on Medicaid and CHIP Enrollment*, KFF (Dec. 2, 2025), https://www.kff.org/medicaid/potential-chilling-effects-of-public-charge-and-other-immigration-policies-on-medicaid-and-chip-enrollment/ [https://perma.cc/Q3CA-F4KN].

charge determinations." 64 Fed. Reg. 28689. The INS assured the public that "certain federal, state, and local benefits are increasingly being made available to families with incomes far above the poverty level" and asserted that "participation in such non-cash programs is not evidence of poverty or dependence." *Id*. at 28692.

182. More recent evidence of the impact of the 2019 Rule confirms the likelihood of a widespread chilling effect. Following implementation of the 2019 Rule, survey data found that more than one in seven adults (15.6%) in immigrant families reported avoiding a noncash government benefit program—such as Medicaid, SNAP, or housing subsidies—out of fear of risking their future green card status, with the share rising to more than one in four adults (26.2%) for low-income immigrant families.[4]

183. In promulgating the 2022 Rule, DHS acknowledged that "the 2019 Final Rule caused fear and confusion among U.S. citizens and noncitizens and had a significant chilling effect on the use of public benefits by noncitizens, even among those who were not subject to the rule and with respect to public benefits that were not covered by the rule." 87 Fed. Reg. 55505. DHS further acknowledged "evidence that the 2019 Final Rule, and the rulemaking process that preceded it, resulted in significant disenrollment effects among noncitizens and U.S. citizens in immigrant families." *Id*.

184. Defendants acknowledged that the 2026 Final Rule will also result in substantial chilling effects, noting that the 2019 Rule resulted in disenrollment rates as high as 35% among

---

[4] Hamutal Bernstein et al., *Amid Confusion over the Public Charge Rule, Immigrant Families Continued Avoiding Public Benefits in 2019*, Urb. Inst. 5 (May 2020), https://www.urban.org/sites/default/files/publication/102221/amid-confusion-over-the-public-charge-rule-immigrant-families-continued-avoiding-public-benefits-in-2019_3.pdf [https://perma.cc/GZ7C-G7KJ].

mixed-status families in key safety net programs, including Medicaid, SNAP, and TANF. 91 Fed. Reg. at 45461. Defendants estimated a 10.3% rate of disenrollment or forgone enrollment in public benefits programs, while conceding that actual disenrollment rates could be even higher. *Id*. at 45462.

**2. The Final Rule will cause harm to Plaintiff States' proprietary interests.**

185. The Final Rule's predictable chilling effects and the resulting disenrollment and forgone enrollment will, in turn, cause direct, proprietary harm to the Plaintiff States. The Final Rule will harm Plaintiff States by causing the loss of federal funding associated with all eligible individuals who choose to disenroll or forgo enrollment due to fears about public charge determinations.

186. Defendants' own conservative estimates predict that the Final Rule will result in a significant drop in transfers of federal funds to state governments for programs like Medicaid and SNAP. Specifically, Defendants estimate that nationwide, states will lose an estimated $4.05 billion in annual transfer payments from the federal government for the States' Medicaid and CHIP programs alone. 91 Fed. Reg. 45468. Of that nationwide total, Plaintiff States stand to lose approximately $2.2 billion in reduced federal payments.

187. Plaintiffs receive 50 percent or more in federal matching funds for all qualified Medicaid expenditures. When noncitizens, or their citizen family members, choose not to apply for federally funded Medicaid benefits for which they are eligible, Plaintiffs are left with fewer resources for providing their residents with access to healthcare.

188. Plaintiffs will also lose federal funds for programs administered by the States that rely solely on federal funds. Defendants' own conservative estimates predict that the Final Rule will cause states to lose more than $1 billion in annual federal funding for the SNAP program due

to disenrollment. 91 Fed. Reg. at 45468 n.355; *see also* 90 Fed. Reg. at 52216. Of that total, Plaintiff States stand to lose approximately $575 million in reduced federal payments.

189. When a child's enrollment in means-tested public benefits programs jeopardizes their noncitizen parent's own immigration status, parents are less likely to enroll their children in those programs, even if their children are U.S. citizens. Therefore, even though a citizen child is eligible for health insurance under CHIP, for example, the Final Rule will still predictably lead to reduced enrollment in CHIP.

190. In addition to causing direct loss of federal transfers for key state programs, the Final Rule will require diversion of the States' own funds and administrative resources. The 2019 Rule required state agencies to make substantial changes to communications, staff training, and coordination with other state and federal systems. Defendants acknowledge that the 2026 Final Rule will again force state Medicaid agencies and other entities to incur administrative costs, including for staff training, changes to communications, and modification of information technology systems. 91 Fed. Reg. at 45447-48. It will also increase the States' administrative costs due to "increased 'churn,' where eligible individuals and families cycle on and off public benefit programs more frequently." *Id*. at 45472.

191. The Final Rule will undermine investments Plaintiff States have made in broad-based, accessible access to public benefit programs that promote integration and upward mobility of state residents. For example, as a part of their implementation of the ACA, many of the Plaintiff States established a single, accessible statewide application for all affordable health programs offered on their health insurance exchange. When designing application and eligibility systems for their ACA marketplaces, Plaintiffs relied upon well-settled judicial and administrative interpretations of the public charge test that strictly limited consideration of healthcare benefits in

public charge determinations. The Final Rule will undermine the effectiveness of those carefully designed systems by creating new, vague, and open-ended risks to immigration status associated with enrollment in subsidized ACA marketplace healthcare plans.

192. The Final Rule's predictable result of reduced participation in public benefit programs by noncitizens, as well as by their citizen family members, will also cause direct harm to Plaintiff States' programs that are intended to promote public health and welfare through broad-based access to publicly funded services.

193. Decreased enrollment in Medicaid and other low-cost insurance programs will reduce the effectiveness of state programs and initiatives that rely on broad-based access to preventive healthcare, such as vaccination campaigns and prenatal coverage and care.

194. Without health insurance, noncitizens and their family members will be more likely to rely on emergency rooms for medical care, and more likely to present with far more complex and expensive conditions to treat due to deferred primary and preventive care. These conditions include diseases that are easy and inexpensive to treat at early stages but can become deadly and more expensive as they progress, such as tuberculosis and syphilis.

195. The Final Rule's predictable effect of leaving more residents uninsured will cause financial harm to the health systems and programs operated by the States, their agencies, and their political subdivisions. Public hospitals rely on enrollment of the States' eligible residents into publicly funded affordable coverage programs like Medicaid, CHIP, Medicare, and subsidized ACA plans to remain financially stable. The 2026 Rule will cause the States' publicly funded safety net healthcare providers to provide more uncompensated care, 84 Fed. Reg. at 41384, 41486; 91 Fed. Reg. 45471, decreasing revenue and undermining those providers' overall financial sustainability.

196. Decreased enrollment in publicly funded affordable coverage programs will make it harder for the States' safety net hospitals to sustain access to quality emergency care for vulnerable populations and to meet their obligations to provide those services under EMTALA. As individuals who fear immigration consequences due to the Final Rule become less willing to enroll in emergency Medicaid to cover their treatment, hospitals (including state-operated facilities) will increasingly incur uncompensated costs for those patients who lack private insurance or the ability to pay out of pocket. And because individuals without health insurance generally wait longer to seek needed care, the care they eventually receive from emergency rooms will be more costly.

197. This loss of funding will disproportionately impact hospitals that operate in low-income communities and community health centers, including community clinics and federally qualified health centers that already operate on very thin margins. Some safety net providers will need to reduce services or even cease operating due to loss of funding.

198. The Final Rule's chilling impact on noncitizens' and their families' willingness to receive federally and state-funded nutrition assistance will also cause direct, proprietary harms that extend far beyond immediate loss of federal funding.

199. For example, Plaintiffs rely on Census Bureau data on SNAP benefits to calculate the Supplemental Poverty Measure, which serves as an additional indicator of economic well-being and provides a deeper understanding of economic conditions and policy effects. Plaintiff States use this measure, along with other poverty and economic data, to assess the need for anti-poverty programs, inform budget and policy decisions, and direct resources to affected communities. Disenrollment from SNAP will undermine the accuracy of this measure and the Plaintiff States' ability to understand national and statewide economic conditions.

200. The Final Rule will also harm the States' administration of school meals programs like the National School Lunch Program and School Breakfast Program. In some Plaintiff States, because the school meal programs' automatic enrollment process is linked to a specific threshold of participation in SNAP and Medicaid, any drop in enrollment of eligible children will lead to a loss of automatic certification for some institutions, and entire schools or districts losing comprehensive access to free or reduced-price school meals. Loss of automatic certification will harm the States' ability to offer some students in lower-income areas—who are not themselves eligible for or enrolled in nutritional assistance but may nevertheless benefit from accessing school meals—access to healthy meals provided by their local school to all children.

201. States also stand to lose other federal funds if families are less likely to report their financial need. For example, federal Title I funding awards for public schools are tied to the number of low-income children served by a particular school. In some instances, Medicaid and SNAP enrollment is used as a metric to determine the number of low-income students served; if children are not enrolled in these programs, low-income students will be present but undercounted, Title I funds will decrease, and public schools will be left to serve the same number of students with fewer funds, or seek state and local funding to replace the lost federal funds.

**3. The Final Rule will cause additional harm to Plaintiff States' interests and public health and welfare.**

202. In addition to directly harming the Plaintiff States' proprietary interests in funding and administration of key state programs, the Final Rule will cause harm to public health and welfare generally, leading to additional costs and burdens on both the Plaintiff States and the public interest writ large.

203. As DHS acknowledged when finalizing the 2019 Rule, *see* 84 Fed. Reg. at 41313, chilling effects caused by its removal of longstanding limits on public charge determinations will

have far-reaching consequences with respect to food insecurity, housing scarcity, public health and vaccinations, education health-based services, reimbursement to health providers, and concomitant increased costs to the States and localities.

204. The Final Rule's predictable consequences of decreased rates of enrollment in affordable health insurance programs and decreased access to primary and preventive healthcare will cause significant harm to population health in Plaintiff States' jurisdictions. Defendants' own predictions suggest that the Final Rule will cause "[w]orse health outcomes, such as increased prevalence of obesity and malnutrition (especially among pregnant or breastfeeding women, infants, and children), reduced prescription adherence, and increased use of emergency rooms for primary care due to delayed treatment." 91 Fed. Reg. 45471. Reduced access to contraceptives and other family planning services will lead to higher rates of unintended pregnancy, increasing health costs. Other negative health outcomes stemming from delayed and deferred care include later-stage disease detection, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality from late-stage diseases. Children who are uninsured in their early years experience worse health, income, and employment outcomes well into adulthood.

205. The Final Rule will reduce the Plaintiff States' ability to respond effectively to communicable disease outbreaks. Access to preventive care is an essential tool used by Plaintiff States to prevent, prepare for, and respond to the spread of serious, but preventable communicable diseases that can harm the overall health of the population. Defendants concede that the Final Rule may lead to "[h]igher prevalence of communicable diseases, including among U.S. citizens who are not vaccinated." 91 Fed. Reg. 45471. These preventable diseases include measles, polio, and sexually transmitted infections. Diseases that disproportionally impact agriculture and other

industries with large immigrant workforces, such as avian influenza or "bird flu," will be disproportionately exacerbated.

206. Ultimately, as the insurers of last resort and the owners and operators of safety net healthcare facilities, States and their localities will bear a portion of any and all costs associated with any delays in diagnosis and treatment of serious medical conditions, unintended pregnancies, and preventable diseases.

207. The Final Rule's predictable reduction in participation in supplemental nutritional assistance programs will also harm Plaintiffs' ability to combat hunger and food insecurity in their states.

208. Food banks struggled to fill nutrition gaps that grew, in part, when immigrants began to avoid public food assistance programs due to the 2019 Rule. Food banks in the Plaintiff States provide assistance to millions of individuals, including children. If individuals avoid the SNAP benefits for which they are eligible, the number of individuals turning to emergency food banks will grow and those organizations' ability to address food insecurity will decrease.

209. Reduced participation in supplemental nutrition assistance programs will harm public health and well-being. Food insecurity can wreak havoc on an individual's health, including increasing the risk of chronic diseases, such as diabetes and hypertension, harm emotional and mental wellbeing, including driving depression and anxiety, and can also make managing these conditions more difficult. Low-income adults participating in SNAP incur about $1,400 less in medical care costs in a year than comparable non-participants.

210. Food insecurity has particularly harmful direct and indirect impacts on the health, development, and well-being of children. Food insecurity leads to depression, fatigue, poor self-

efficacy, and behavioral problems. Children who go without sufficient nutrition are more likely to struggle to learn in classrooms, harming their own educational advancement and that of their peers.

211. The 2019 Rule reduced participation in WIC, even though it was formally exempted from consideration. WIC provides supplemental nutrition benefits and other health supports, like nutrition education, breastfeeding support services, and referrals to other health and social services. When mothers and their children participate in WIC, the risks of birth complications, malnutrition, and morbidity are reduced. By deterring non-citizens or their family members from accessing these services, the Final Rule will again put women, infants, and children at increased risk of short- and long-term adverse health effects that are correlated with lack of access to the services and supports offered by WIC.

212. As DHS has acknowledged when finalizing the 2019 Rule, the 2026 Final Rule's chilling effect on participation in SNAP and other nutrition programs will also cause economic harm. *See* 84 Fed. Reg. 41477 (recognizing that reductions in federal and state transfers under benefit programs may have downstream impacts on state and local economies, large and small businesses, and individuals). SNAP benefits generate secondary economic effects that increase overall spending and production; the USDA estimates that every $1 in SNAP benefits can generate up to $1.54 in economic activity. Decisions by immigrant families to forgo nutritional benefits for which they are eligible will also result in loss of that economic activity. The Final Rule will particularly harm smaller farms and grocers, and others who operate on small margins.

213. Similarly, decreases in enrollment in health insurance programs will result in decreases in revenue to healthcare providers, which causes additional economic harm within the states.

214. The threat that immigration officials will use this expanded public charge test to deny noncitizens' requests to obtain green cards or otherwise seek admission will also cause broader economic harm by reducing productivity in key sectors of Plaintiff States' economies. Receipt of limited governmental assistance, particularly in the form of food assistance, housing, and health insurance subsidies, enables immigrants and their families to maintain employment, continue healthy and stable lives, and to contribute fully to the federal and state economies. As the Second Circuit recognized, the States "seek to protect the economic benefits that result from healthy, productive, and engaged immigrant communities." *New York*, 969 F.3d at 63. The States are already experiencing labor shortages in key sectors that are critical to the economy such as agriculture, construction, healthcare, childcare and early childhood education, food services, and janitorial and maintenance services. The Final Rule will reduce productivity in Plaintiff States and disrupt their labor markets.

## CAUSES OF ACTION

### COUNT I
### Violation of the Administrative Procedure Act – Contrary to Law and in Excess of Statutory Authority

215. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

216. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

217. The Final Rule and Guidance are "final agency actions" for the purposes of the APA. 5 U.S.C. § 704.

218. The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law, or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

219. Congress ratified "the prevailing administrative and judicial interpretation of 'public charge,'" to mean "a non-citizen who cannot support himself, in the sense that he is incapable of earning a livelihood, . . . does not have sufficient funds in the United States for his support, and has no person in the United States willing and able to assure that he will not need public support." *New York,* 969 F.3d at 74–75 (cleaned up).

220. In contrast, the Final Rule improperly replaces the established meaning of "public charge," which Congress codified in IIRIRA, *see* 8 U.S.C. §§ 1182(a)(4), 1183a, with unbounded discretion for immigration officers to determine the meaning of "public charge" with no administrable standards for how to weigh the type, amount, duration, recency, or purpose of the means-tested benefits they consider when deciding whether someone is likely at any time to become a "public charge."

221. By Defendants' own admission, the 2026 Rule's expansion of the Public Charge ground of inadmissibility would allow officers to classify individuals as "public charges" "even where they are not primarily dependent on the government." 90 Fed. Reg. at 52186.

222. The 2026 Final Rule and the Guidance eliminate any discernible standards regarding which information immigration officers can consider for purposes of the public charge determination and to what degree, and instead empower them "to consider not only the mandatory statutory factors. . . but also all relevant evidence and information in the record specific to the alien as the officers determine whether that alien is likely at any time to become a public charge." 91 Fed. Reg.at 45331; *see also* 90 Fed. Reg. at 52183.

223. The 2026 Final Rule and the Guidance exceed what the INA permits by enabling immigration officers to consider, for example, a child's lawful use of supplemental means-tested

public benefits, in making a public charge determination against the child or against the child's noncitizen parents.

224. The 2026 Final Rule and the Guidance also go beyond what is permitted by the INA by allowing immigration officers to consider use of benefits that are universally available to any resident where they live, irrespective of the individual's income or wealth (for example, participation in school lunch programs that are available to all students, without any means-testing or any other fact that is specific to the noncitizen applying for admission).

225. The Final Rule and Guidance's expansive approach to "public charge" rejects the well-established meaning of the term. 8 U.S.C. §§ 1182(a)(4), 1183a. The new scheme set forth in the Final Rule and the Guidance will allow individual officers to exercise a level of discretion that is contrary to the intent of Congress, based on a statement of congressional intent in PRWORA, while ignoring statements of congressional intent that support broad, unimpeded access to means-tested public benefits by eligible persons. *See, e.g.*, 42 U.S.C. § 1771.

226. Additionally, Defendants may only exercise authority conferred by statute, and when an executive agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

227. Through the Final Rule and the Guidance, Defendants have disregarded and set aside the settled meaning of "public charge," ratified by Congress. Nothing in the INA, or any federal statute, empowers Defendants to override Congress. Defendants are not authorized by any federal statute to self-confer such discretion. In so doing, the Final Rule exceeds Defendants' statutory authority. *See* 8 U.S.C. § 1182(a)(4).

228. By promulgating this Final Rule, by itself or as informed by the Guidance, Defendants have acted contrary to the INA. In doing so, Defendants have taken action in violation of the APA. The Final Rule is therefore invalid.

229. Defendants' violation causes ongoing harm to Plaintiff States.

230. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Final Rule violates the APA because it is contrary to law and in excess of statutory authority.

231. Plaintiff States are also entitled to vacatur of the Final Rule pursuant to 5 U.S.C. § 706.

232. In the alternative, to the extent that the Court concludes that the Guidance is independently reviewable agency action or supplies operative standards governing public charge inadmissibility determinations, the Guidance itself is contrary to law and in excess of statutory authority, and that must accordingly be "[held] unlawful and set aside." 5 U.S.C. § 706(2)(A), (C). Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Guidance violates the APA because it is contrary to law and in excess of statutory authority, and are also entitled to vacatur of the Guidance pursuant to 5 U.S.C. § 706.

**COUNT II**
**Violation of the Administrative Procedure Act – Arbitrary and Capricious**

233. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

234. Under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made")

(quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"). A court must also set aside agency action if the agency "failed to consider . . .important aspect[s] of the problem before" it. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (citation omitted).

235. The Final Rule and the Guidance are arbitrary and capricious in numerous ways, including because they institute a new system, departing from established prior policy, under which immigration officials have boundless authority to render public charge determinations based on any benefits use, or any other "fact or circumstance the officer determines is relevant." 91 Fed. Reg. at 45347; *see also* Ex. A at 13, 53. In fact, the Final Rule and the Guidance provide no clear or administrable standards. Defendants have provided no reasonable explanation for this sweeping policy change, let alone a detailed one as required under the APA.

236. The Final Rule and the Guidance are arbitrary and capricious because they rest on erroneous legal and factual conclusions, such as "all benefits received have bearing on whether an alien is likely at any time to become a public charge." 91 Fed. Reg. 45393. This is inconsistent with the settled meaning of "public charge." Similarly, Defendants' repeated invocation of PRWORA erroneously attempts to justify a new application of public charge determinations based on a statute that did not address "public charge," and which instead made noncitizens eligible for certain benefits, the use of which Defendants now seek to penalize under their expansive public charge regime. This is not reasoned decision-making.

237. The Final Rule and the Guidance are arbitrary and capricious because they fail to consider many important aspects of the problem. The Final Rule and the Guidance fail to consider the actual probative value that the receipt of particular benefits have on whether an individual will become dependent on the government as a "public charge," nor do Defendants adequately consider the harms of including those benefits in public charge determinations. The Final Rule and the Guidance also fail to consider that the use of some types of public benefits, or the use of benefits for a limited period, is not evidence of "dependence" on federal benefits programs. Defendants failed to consider alternative rules that would narrow the scope of public benefits that immigration officers can consider. The Final Rule and the Guidance also fail to consider the purpose of the public benefit programs and laws. Finally, the Final Rule and Guidance also do not consider the States' reliance interests, including the complex administrative systems that Plaintiff States have developed for public benefits administration in reliance on the public benefits programs and eligibility rules created by Congress and Defendants' longstanding use of a "primary dependence" standard for public charge determinations.

238. The Final Rule and the Guidance are also arbitrary and capricious because they are impermissibly ambiguous. They do not provide Plaintiff States or the public with clear information on the new public charge standards. They fail to provide any limits or bounds on the evidence that immigration officers may rely on in making public charge determinations, repeatedly stating that immigration officers may use "all relevant evidence and information," 91 Fed. Reg. 45413, including use of a wide range of public benefits. The Final Rule and the Guidance also effectively apply retroactively when it comes to consideration of the use of some public benefits.

239. The Final Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A).

240. Defendants' violation causes ongoing harm to Plaintiff States.

241. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Final Rule violates the APA because it is arbitrary and capricious.

242. Plaintiff States are also entitled to vacatur of the Final Rule pursuant to 5 U.S.C. § 706.

243. In the alternative, to the extent that the Court concludes that the Guidance is independently reviewable agency action or supplies operative standards governing public charge inadmissibility determinations, the Guidance itself is "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA, and that must accordingly be "[held] unlawful and set aside." 5 U.S.C. § 706(2)(A), (C). Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Guidance violates the APA because it is arbitrary and capricious, and are also entitled to vacatur of the Guidance pursuant to 5 U.S.C. § 706.

**COUNT III**

**In the Alternative: Violation of the Administrative Procedure Act – Failure to Adhere to Notice and Comment Procedures**

244. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

245. The Guidance is a "final agency action" for the purposes of the APA. 5 U.S.C. § 704.

246. To the extent that the Court concludes that the Guidance supplies the operative standards governing public charge inadmissibility determinations, Plaintiffs further challenge the Guidance as a legislative rule issued without required notice and comment procedures. If the Guidance supplies operative standards governing public charge determinations, then the Guidance does not merely interpret an existing regulatory standard. Instead, the Guidance supplies the

substantive replacement standards for the rescinded legislative rule. When legislative rules are promulgated, notice and comment rulemaking procedures are required under the APA. 5 U.S.C. § 553.

247. In the Final Rule, Defendants represented that USCIS would issue "nonbinding subregulatory guidance" that would be a "general statement of policy," would "not have the force and effect of law," and would therefore "be exempt from notice and comment rulemaking." 91 Fed. Reg. 45338. The Final Rule further stated that this guidance would go into effect "on the effective date of this final rule." *Id*.

248. The Guidance states that it "stems from" rescission of the 2022 Final Rule and is intended to provide guidance to USCIS officers in making public charge inadmissibility determinations. Ex. A at 3. After the Final Rule rescinds the 2022 regulations that defined "public charge," limiting the benefits that could be considered and cabining officer discretion, the Guidance will supply the replacement framework USCIS officers will use going forward. Like the Final Rule, the Guidance materially expands the benefits officers may consider, authorizes consideration of applications, approvals, certifications, and receipt of means-tested benefits, and gives officers unfettered discretion to determine how much weight to assign those facts in the totality of the circumstances. *See, e.g., id.* at 50-51.

249. The Guidance gives content to the 2022 Final Rule's rescission and establishes the framework officers will use to determine whether noncitizens are likely at any time to become "public charges." If the Guidance supplies operative standards governing public charge inadmissibility determinations after the rescission of the 2022 regulations, it functions as the substantive replacement of those regulations. Under the APA, an agency may not use subregulatory guidance to effectively amend or replace a legislative rule without notice and comment. See *Elec.*

*Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011) (citing *Am. Mining Cong. v. Mine Safety & Health Admin*., 995 F.2d 1106, 1112 (D.C. Cir. 1993)); *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("Of course, if an agency issues a statement that is labeled an interpretive rule or a policy statement and it has all the indicia of a final legislative rule, then the rule will be subject to review.").

250. If the Guidance supplies operative standards governing public charge inadmissibility determinations, it materially affects the rights and obligations of applicants for admission or adjustment of status. It also materially affects Plaintiff States by chilling participation in Plaintiff States' public benefit programs and forcing Plaintiff States to respond to the confusion, disenrollment, and administrative burdens it creates.

251. Defendants did not provide notice and an opportunity to comment on the Guidance before issuing it. Nor did Defendants provide Plaintiff States or the public an adequate opportunity during the Final Rule's rulemaking process to comment on the specific standards later announced in the Guidance.

252. Defendants therefore issued the Guidance without observance of procedure required by law, in violation of 5 U.S.C. §§ 553 and 706(2)(D).

253. Defendants' violation causes ongoing harm to Plaintiff States. If the Court concludes that the Guidance is a substantive, legislative rule, it should be vacated or set aside for failure to comply with required notice and comment procedures.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

i. Pursuant to 5 U.S.C. § 706, vacate the Final Rule;

ii. Issue a judicial declaration that the Final Rule is contrary to law, in excess of statutory authority, and arbitrary and capricious in violation of the Administrative Procedure Act;

iii. To the extent the Guidance supplies operative standards governing public charge inadmissibility determinations, vacate the Guidance pursuant to 5 U.S.C. § 706, and issue a judicial declaration that the Guidance is contrary to law, in excess of statutory authority, and arbitrary and capricious, and was issued improperly without required notice and comment rulemaking in violation of the Administrative Procedure Act;

iv. Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and,

v. Grant other such relief as this Court may deem proper.

Dated: September 14, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General of the State of New York

By: *<u>/s/ Natasha M. Korgaonkar</u>*
Natasha M. Korgaonkar
Zoe Levine
*Special Counsels*
Benjamin D. Liebowitz
*Assistant Attorney General*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Judith Vale
*Deputy Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6557
Natasha.Korgaonkar@ag.ny.gov
Zoe.Levine@ag.ny.gov
Benjamin.Liebowitz@ag.ny.gov
Rabia.Muqaddam@ag.ny.gov
Judith.Vale@ag.ny.gov

**ROB BONTA**
Attorney General for the State of California

By: *<u>/s/ Anna Rich</u>*
Michael L. Newman
Neli N. Palma*
*Senior Assistant Attorneys General*
Nicholas Espíritu*
Robin L. Goldfaden*
Kathleen Boergers*
*Supervising Deputy Attorneys General*
Julia Heming Segal*
Kevin Reyes*
Anna Rich*
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
510-879-0296
Anna.Rich@doj.ca.gov

*Counsel for the State of California*

*Counsel for the State of New York*

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Paul Berks*
Cara Hendrickson*
*Executive Deputy Attorney General*
Paul Berks*
*Complex Litigation Counsel*
Christina Mahoney*
*Deputy Attorney General*
Alice L. Riechers*
*Senior Assistant Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000
Cara.hendrickson@ilag.gov
Paul.berks@ilag.gov
Christina.mahoney@ilag.gov
Alice.riechers@ilag.gov

*Counsel for the State of Illinois*

**PHIL WEISER**
Attorney General of Colorado

By: */s/ Gabe Podesta*
Gabe Podesta*
*Senior Assistant Attorney General*
1300 Broadway, 10th Fl.
Denver, CO 80203
(720) 508-6000
gabe.podesta@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Alexandra Quental*
Alexandra Quental*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Alexandra.Quental@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: /s/ *Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General of the District of Columbia

*/s/ Nicole S. Hill*

**ANNE LOPEZ**
Attorney General of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*

Nicole S. Hill*
*Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov

*Counsel for Plaintiff District of Columbia*

Kaliko'onālani D. Fernandes*
*Solicitor General*
Hawai'i Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
Kaliko.D.Fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

**AARON M. FREY**
Maine Attorney General

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Yasmin Dagne*
Yasmin Dagne*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Michelle R. Pascucci*
Michelle R. Pascucci*
*State Trial Counsel*
Phoebe M. Lockhart*
Thomas P. Furlong*
*Assistant Attorneys General*
1 Ashburton Pl.
Boston, MA 02108
Phone: 617-963-2255
michelle.pascucci@mass.gov
phoebe.lockhart@mass.gov
thomas.furlong@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General for the State of Michigan

By: */s/ Daniel Ping*
Daniel J. Ping
Neil S. Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 241-1050
PingD@michigan.gov
GiovanattiN@michigan.gov

*Counsel for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: /s/ Joseph R. Richie
Joseph R. Richie
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0921
joseph.richie@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

By: /s/ K. Brunetti Ireland
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: /s/ Max Lesser
Max Lesser*
*Deputy Attorney General*
25 Market Street, 8th Floor
Trenton, NJ 08625
(609) 376-3377
Max.lesser@njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
New Mexico Attorney General

By: /s/ Amanda Butler
Amanda Butler*
*Senior Counsel*
New Mexico Department of Justice
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501
ABulter@nmdoj.gov

*Counsel for the State of New Mexico*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: /s/ Galen Knowles
Galen Knowles*
*Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Galen.Knowles@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
In his official capacity as Governor of the Commonwealth of Pennsylvania

By: /s/ Michael J. Fischer
Jennifer Selber*
*General Counsel*
Michael J. Fischer*
*Executive Deputy General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Patrick Reynolds*
Patrick Reynolds*
*Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400
preynolds@riag.ri.gov

*Counsel for the State of Rhode Island*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: /s/ *Faye B. Hipsman*
Faye B. Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov

*Counsel for the State of Wisconsin*

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Samuel B. Stratton*
Samuel B. Stratton*
*Assistant Attorney General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
sam.stratton@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s/ Kate S. Worthington*
Kate S. Worthington*
*Assistant Attorney General*
Complex Litigation Division
Washington State Office of the Attorney General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(306) 709-6470
kate.worthington@atg.wa.gov

*Counsel for the State of Washington*

* *Pro hac vice* motion forthcoming