# EXHIBIT C

LETITIA JAMES
ATTORNEY GENERAL

KWAME RAOUL
ATTORNEY GENERAL

ROB BONTA
ATTORNEY GENERAL

KEITH ELLISON
ATTORNEY GENERAL

December 19, 2025

**Via Federal eRulemaking Portal and U.S. Mail**

Kristi Noem
Secretary, United States Department of Homeland Security
2707 Martin Luther King, Jr. Ave. SE
Washington, DC 20528

Joseph B. Edlow
Director, U.S. Citizenship and Immigration Services
United States Department of Homeland Security
5900 Capital Gateway Drive
Camp Springs, MD 20746

Re: Objection to DHS and USCIS's Proposed Rule concerning Public Charge Ground of Inadmissibility (November 19, 2025), RIN 1615-AD06, CIS No. 2836-25, DHS Docket No. USCIS-2025-0304

Dear Secretary Noem and Director Edlow,

We, the Attorneys General for the States of New York, Illinois, California, Minnesota, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, the Commonwealth of Massachusetts, Michigan, Nevada, Oregon, Rhode Island, Vermont, Washington, the District of Columbia, New Jersey, and New Mexico (the "States") write to object to *Public Charge Ground of Inadmissibility*, RIN 1615-AD06 [CIS No. 2836-25; DHS Docket No. USCIS-2025-0304] (the "Proposed Rule" or "NPRM"), a rule proposed by the U.S. Department of Homeland Security ("DHS") and United States Citizenship and Immigration Services ("USCIS") and published in the Federal Register on November 19, 2025.[1]

[1] *Public Charge Ground of Inadmissibility*, 90 Fed. Reg. 52,168 (Nov. 19, 2025).

In 2022, DHS promulgated a public charge rule (the "2022 Rule"), which largely memorialized what had been the nearly-uninterrupted, decades-long understanding of the meaning and application of the "public charge" provision of the Immigration and Nationality Act ("INA").[2] The Proposed Rule rescinds the 2022 Rule and signals a radical new approach that would give USCIS officials free rein to penalize immigrants for accessing healthcare and public programs that the States and their communities have determined contribute to health, safety, and economic prosperity. The Proposed Rule is not only bad policy, but it is also inconsistent with the well-settled meaning of the INA's "public charge" provision. Moreover, the Proposed Rule is vague; may retroactively penalize residents' lawful use of benefits; and will undermine federal, state, and local benefits programs that were indeed designed to help support immigrants' upward mobility. Meanwhile, the States will be forced to shoulder increased costs and administrative burdens.

Despite the magnitude of the federal government's apparent change in policy, the agency has provided a mere thirty days for public comment. This amount of time is inadequate to collect and analyze all of the information relevant to a rule change of this level of importance and complexity, particularly in light of the ambiguities created by the Proposed Rule. As the States explained in their November 25 letter, USCIS should extend the comment period to enable sufficient time for all stakeholders to identify all potential impacts and relevant evidence. The shortened public comment period also makes it all the more important to consider all prior evidence in the administrative record and prior factual findings that were before the agency when it issued the 1999 Guidance and promulgated prior public charge regulations.

For all of the reasons discussed herein, the Proposed Rule should be withdrawn.

## I. Background

The INA bars admission of "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the [Secretary of Homeland Security] at the time of application for admission or adjustment of status, is likely at any time to become a public charge."[3] Under federal immigration law, "public charge" is a legal term of art that Congress adopted and maintained for more than a century, including after the federal judiciary and immigration agencies consistently applied that term to exclude only "an individual with the inherent inability to be self-supporting."[4]

---

[2] *See* Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14,221 (Mar. 15, 2021) (codified at 8 C.F.R. pts. 103, 106, 212–14, 245, 248) (rescinding 2019 Rule); Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55,472 (Sept. 9, 2022) (codified at 8 C.F.R. pts. 103, 212, 213, 245) (implementing the 2022 Rule).

[3] 8 U.S.C. § 1182(a)(4)(A).

[4] *City and County of San Francisco v. U.S. Citizenship and Imm. Servs.*, 981 F.3d 742, 752 (9th Cir. 2020), *cert. dismissed*, 141 S. Ct. 1292 (2021) (citing *Matter of Harutunian*, 14 I & N. Dec. 583, 589-90 (BIA 1974)).

**a. Historical usage of public charge**

Congress first enacted the public charge provision in 1882, when it rendered any "convict, lunatic, idiot, or any person unable to take care of [themselves] without becoming a public charge" excludable and prevented them from entering the country.[5] From the beginning, "public charge" thus was understood to refer to the small fraction of immigrants likely to "become life-long dependents on our public charities."[6] Congress did not exclude immigrants who might be poor or require some public assistance to promote their well-being or upward mobility; legislators recognized that such persons could "become a valuable component part of the body-politic."[7] Indeed, Congress directed the collection of a per-person tax "for the support and relief" of immigrants who "may fall into distress or need public aid,"[8] to fund support for immigrants "when they arrive . . . until they can proceed to other places or obtain occupation for their support."[9]

In the decades that followed, Congress repeatedly reenacted substantially similar public charge provisions, which courts interpreted as being limited to the few individuals who were unable to support themselves and were thus likely to depend almost entirely on the government for long-term subsistence.[10] "Public charge" did not include immigrants "able to earn [their] own living," even if they were not wealthy and were receiving some form of public assistance.[11]

Congress ratified and incorporated this established meaning of "public charge" into the INA when it reenacted the public charge ground of inadmissibility "without pertinent change" in 1952 and again in 1996.[12] Before and throughout that time period, "[t]he absolute bulk of the caselaw, from the Supreme Court, the circuit courts, and the [Board of Immigration Appeals (BIA)] interpret[ed] 'public charge' to mean a person who is unable to support herself, either through work, savings, or family ties."[13] For example, in 1962, the U.S. Attorney General "summarize[d] the 'extensive judicial interpretation' of the term as requiring a particular

---

[5] Immigration Act of 1882, Pub. L. No. 47-376, ch. 376, § 2, 22 Stat. 214.
[6] 13 Cong. Rec. 5109 (1882) (statement of Rep. Van Voorhis).
[7] *Id.* at 5108.
[8] Immigration Act of 1882, §§ 1-2, 22 Stat. at 214.
[9] 13 Cong Rec. 5106 (1882) (statement of Rep. Reagan).
[10] *See, e.g.*, *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915) ("public charge" means individuals unable to work due to "permanent personal objections"); *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917) ("Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future."); *Ex parte Hosaye Sakaguchi*, 277 F. 913, 916 (9th Cir. 1922) (public charge does not include "able-bodied woman" with "disposition to work"); *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) ("public charge" means persons without "permanent means of support, actual or contemplated").
[11] *Ex parte Mitchell*, 256 F. 229, 230 (N.D.N.Y. 1919).
[12] *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 70 (2d Cir. 2020), *cert. granted*, 141 S. Ct. 1370, *cert. dismissed*, 141 S. Ct. 1292 (2021).
[13] *Id.* at 71.

circumstance, like disability or age, that shows that 'the burden of supporting the alien is likely to be cast on the public[.]'"[14] "The BIA came to a similar conclusion after its own review of the public charge caselaw and legislative history" and "rejected the notion that receipt of public benefits categorically renders one a public charge."[15]

Consistent with this body of law, exclusion of immigrants on public charge grounds has always, and appropriately, been rare. Indeed, between 1882, when Congress first enacted the public charge provision, and 1980 (the last year for which exclusion data is publicly available), less than one percent of immigrants were excluded on public charge grounds.[16]

In 1996, Congress enacted two laws concerning public benefit programs. The Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") restricted noncitizens' eligibility for public benefits.[17] *See, infra,* Part I(b). And the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") specified that, "at a minimum," the public charge determination should consider the noncitizen's (1) age, (2) health, (3) family status, (4) assets, resources, and financial status, and (5) education and skills.[18] But Congress did not alter the established meaning of "public charge." On the contrary, that same year Congress rejected a proposal that would have altered the meaning of "public charge" in the deportability context to mean receipt of any supplemental benefits within 12 months.[19]

In 1999, the Immigration and Naturalization Service (the "INS," a predecessor to DHS and USCIS) issued field guidance (the "1999 Guidance") advising officials how to make public charge determinations in light of PRWORA and IIRIRA.[20] This guidance was accompanied by a proposed rule (which was never finalized).[21]

Both the 1999 Guidance and its accompanying proposed rule retained the well-settled judicial and administrative interpretation of the INA that had developed after more than a century of usage when Congress decided to incorporate that interpretation without modification into the 1952 Act. In 1999, the INS defined "public charge" as a noncitizen who is or is likely to become "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt

---

[14] *Id.* (quoting *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (A.G. 1962)).
[15] *Id.*
[16] *See* Dep't of Homeland Sec., Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016, (Dec. 18, 2017), https://www.dhs.gov/immigration-statistics/yearbook/2016/table1; Immigration and Naturalization Serv., 2001 Statistical Yearbook of the Immigration and Naturalization Service Tables 1, 66 (2003), https://perma.cc/CLJ5-KM5L.
[17] *See* Pub. L. No. 104-193, § 403, 110 Stat. 2105, 2265–67 (1996).
[18] *See* Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674–75 (1996).
[19] H.R. Rep. No. 104-828, at 138, 241 (1996) (Conf. Rep.).
[20] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).
[21] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676 (May 26, 1999).

of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense."[22] The 1999 Guidance adopted a "totality of the circumstances" test where "[t]he existence or absence of a particular factor should never be the sole criterion for determining if an alien is likely to become a public charge."[23] In the 1999 Guidance, immigration officials did not give "weight [to] the receipt of non-cash public benefits (other than institutionalization) or the receipt of cash benefits for purposes other than for income maintenance" in making public charge assessments.[24] As the federal agency explained, such supplemental benefits are available "to families with incomes far above the poverty level,"[25] to further public health and upward mobility, rather than long-term subsistence. The federal government continued to interpret the term "public charge" consistent with this guidance, and with more than a century of precedent, for the next 20 years.[26]

Beginning in 2018, the first Trump Administration attempted to greatly broaden the scope of the public charge exclusion and unmoor it from its historical roots. In October 2018, DHS published a notice of proposed rulemaking that would withdraw the 1999 Guidance and the accompanying proposed rule, and replace it with a new definition of "public charge" that would have redefined the criteria of admissibility and adjustment to lawful permanent resident status for immigrants living in the United States, vastly expanding the public benefits that could be considered.[27] DHS received 266,077 comments regarding the proposed rule, "the vast majority" of them in opposition.[28]

In August 2019, DHS issued a final rule (the "2019 Rule").[29] The 2019 Rule adopted a novel and expansive definition of "public charge" to mean a noncitizen "who receives one or more public benefits … for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)."[30] And the 2019 Rule defined "public benefit" to include not only cash assistance but also non-cash benefits, including SNAP (Supplemental Nutrition Assistance Program), Section 8 housing assistance, Medicaid, and public housing.[31] This meant that an individual could be deemed inadmissible if found "likely to receive as little as $20 a month in SNAP benefits for a year."[32]

---

[22] 64 Fed. Reg. at 28,677, 28,689.
[23] 64 Fed. Reg. at 28,690 (emphasis removed).
[24] *Id*.
[25] *Id*. at 28,692
[26] *See* 87 Fed. Reg. at 55,472, 55,495.
[27] *See* Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018).
[28] 84 Fed. Reg. at 41,297; *see also id.* at 41,304–484.
[29] *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019). In October 2018, on just four days' notice, the State Department issued its own rule that mirrored DHS's 2019 Rule. *See* Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54,996 (Oct. 11, 2019).
[30] 84 Fed. Reg. at 41,501.
[31] *Id.*
[32] 87 Fed. Reg. at 55,519.

The specified benefits included not just "cash assistance for income maintenance,"[33] and government paid in-kind care at a nursing home or other institution, but also most Medicaid healthcare coverage and SNAP—common, publicly funded supplemental benefits that are available to individuals with incomes above the poverty line and that are designed to promote public health, nutrition, and upward mobility, rather than to provide long-term subsistence.[34]

The 2019 Rule also prescribed a non-exclusive list of factors to consider in determining whether a noncitizen was likely to become a public charge in the future (*i.e.*, whether they were likely to receive 12 months of benefits in a future 36 month-period).[35] They included family size, English proficiency, credit score, and even *application* for public benefits, regardless of whether benefits had ever been received.[36]

Several courts determined the 2019 Rule was likely unlawful and entered preliminary injunctions enjoining it.[37] Those injunctions were eventually stayed,[38] and the 2019 Rule went into effect in February 2020, while litigation challenging the Rule proceeded.[39] In November 2020, the Northern District of Illinois entered partial final judgment vacating the 2019 Rule.[40]

The Biden Administration returned the public charge exclusion to its historical roots. In 2021, the Department of Justice stopped defending the 2019 Rule and dismissed all pending

---

[33] *Id*. at 55,518.
[34] *See id.* at 55,518-19.
[35] *See id.* at 41,502–04.
[36] *Id.*
[37] *See, e.g., Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 667–68 (S.D.N.Y. 2019), *aff'd as modified sub nom. New York v. DHS*, 969 F.3d 42 (2d Cir. 2020); *Cook Cnty. v. McAleenan*, 417 F. Supp. 3d 1008, 1030–31 (N.D. Ill. 2019), *aff'd sub nom. Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020); *CASA de Md., Inc. v. Trump*, 414 F. Supp. 3d 760, 785–88 (D. Md. 2019), *rev'd and remanded*, 971 F.3d 220 (4th Cir. 2020); *City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1129–30 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020); *Washington v. DHS*, 408 F. Supp. 3d 1191, 1224 (E.D. Wash. 2019), *aff'd in part, vacated in part sub nom. City & Cnty. of S.F. v. USCIS*, 981 F.3d 742 (9th Cir. 2020); *see also Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1011 (N.D. Ill. 2020) (entering partial final judgment vacating 2019 Rule).
[38] *See DHS v. New York*, 589 U.S. 1173 (2020); *CASA de Md., Inc. v. Trump*, No. 19-2222, Dkt. No. 21 at 1 (4th Cir. Dec. 9, 2019); *City & Cnty. of S.F. v. USCIS*, 944 F.3d 773, 781 (9th Cir. 2019).
[39] *See New York v. DHS*, 969 F.3d 42, 58 (2d Cir. 2020).
[40] *Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1011 (N.D. Ill. 2020).

appeals.[41] DHS then rescinded the 2019 Rule and published a new public charge rule (the "2022 Rule").[42] The State Department also published a new rule aligning with the 2022 Rule.[43]

The 2022 Rule restored much of the 1999 Guidance. The 2022 Rule directs immigration officers to consider whether someone is likely to become a public charge by determining whether they are likely "to become primarily dependent on the government for subsistence" based on their receipt of public cash assistance or long-term institutionalization.[44] Under the 2022 Rule, "public cash assistance" is limited solely to Supplemental Security Income ("SSI"), Temporary Assistance for Needy Families ("TANF"), or other "cash benefit programs for income maintenance."[45] DHS must consider "the totality of the alien's circumstances," with "[n]o one factor" being "the sole criterion" for determining he or she is likely to become a public charge.[46] In particular, the 2022 Rule provides that "current and/or past receipt of these benefits will not alone be a sufficient basis to determine whether the alien is likely at any time to become a public charge."[47] And DHS may not consider an individual's receipt of SNAP, CHIP (Children's Health Insurance Program), Medicaid (other than for long-term institutionalization), housing benefits, or other non-cash public benefits.[48]

**b. The Proposed Rule's reliance on PRWORA and relationship with other statutes**

The Proposed Rule, which seeks to rescind the 2022 Rule, implies that PRWORA[49] provides a basis for the rescission. This reliance is misplaced. PRWORA does not speak to public charge determinations, or even to immigration policies more generally. Instead, PRWORA, enacted under Congress's Spending Clause powers, is a public benefits law.

PRWORA addresses which noncitizens may be eligible for certain public federal benefits. It is not an immigration law. The statute speaks to both federal public benefits, providing that "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit,"[50] and also

---

[41] DHS Statement on Litigation Related to the Public Charge Ground of Inadmissibility (Mar. 9, 2021), https://www.dhs.gov/archive/news/2021/03/09/dhs-statement-litigation-related-public-charge-ground-inadmissibility.
[42] *See* Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14,221 (Mar. 15, 2021) (codified at 8 C.F.R. pts. 103, 106, 212–14, 245, 248) (rescinding 2019 Rule); Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55,472 (Sept. 9, 2022) (codified at 8 C.F.R. pts. 103, 212, 213, 245) (implementing the 2022 Rule).
[43] *See* Visas: Ineligibility Based on Public Charge, 88 Fed. Reg. 60,574 (Sept. 5, 2023) (codified at 22 C.F.R. pt. 40).
[44] 8 C.F.R. § 212.21(a).
[45] *Id.* § 212.21(b).
[46] *Id.* § 212.22(b).
[47] *Id.* § 212.22(a)(3).
[48] *Id.*
[49] *See* Pub. L. No. 104-193 (Aug. 22, 1996),
[50] 8 U.S.C. § 1611(a)–(b).

speaks to "State or local public benefit[s]."[51] PRWORA also provides certain exceptions to this general rule,[52] and preserves states' authority to provide state-only benefits to residents irrespective of their status.[53]

Furthermore, to the extent that PRWORA is at all relevant to the Proposed Rule, the statute allows *more* access to public benefits than the Proposed Rule would for noncitizens asserting admissibility. For example, under the Medicaid statute, states must provide coverage to noncitizens in need of emergency medical services, irrespective of their status or their eligibility for Medicaid otherwise.[54] The Proposed Rule acknowledges that PRWORA lists "medical assistance for the treatment of an emergency medical condition" among its exceptions, for which immigration status is not an eligibility factor.[55] Yet, even against this acknowledgement, the Proposed Rule itself does not address how accessing emergency Medicaid coverage would be construed by immigration officers for purposes of admissibility. This leaves open the possibility that individuals will avoid even the most basic and life-saving medical care, access to which is legal under federal law and acknowledged as such by the Proposed Rule, because of the risk that doing so could render them inadmissible.

Indeed, the Proposed Rule lists "increased use of emergency rooms for primary care due to delayed treatment" as among its foreseeable impacts, and one that "may lead to downstream effects on public health, community stability, and resilience."[56] This impact will be exacerbated in light of the sweeping cuts to Medicaid eligibility contained in H.R. 1, which will become effective in October 2026.[57] As a result of the severe cuts, full-scope federally funded Medicaid will become virtually inaccessible for most noncitizens, including those lawfully present and currently eligible for these programs.[58] A number of undersigned States provide state-funded coverage for certain noncitizens, including refugees and others who are lawfully present, because, *inter alia*, such coverage encourages individuals to seek out preventative healthcare services and improves public health overall. Yet the Proposed Rule does not include any assurance that applying for, and/or receiving, such state-funded coverage will not count against a noncitizen during a public charge determination.[59]

---

[51] *Id*. § 1621(a), (d).
[52] 8 U.S.C. § 1611(a)–(b).
[53] 8 USC § 1621(d).
[54] 42 U.S.C. § 1396b(v).
[55] 90 Fed. Reg. 52,176.
[56] *Id*. at 52,218.
[57] Public L. No. 119-21 (Jul. 4, 2025) ("H.R. 1").
[58] *Id*. at Sec. 71109.
[59] The States have already received reports indicating concerning increases in DHS/USCIS's use of the public charge ground for deportability, in ways that amplify concerns about how the agencies will move forward if the 2022 Rule is rescinded under the NPRM. *See* 8 U.S.C. § 1227(a)(5) (INA § 237(a)(5)). Some such reports indicate that individual DHS/USCIS officers are construing the use of state and local

Put differently, at the outset, H.R. 1 will severely reduce access to Medicaid (and CHIP) for noncitizens, and, next, the Proposed Rule would cause those same noncitizens to either (a) forgo state-funded preventative health coverage, or (b) undertake the risk that lawfully applying for or accessing such state-funded coverage will jeopardize their admissibility determination and potentially render them inadmissible. Without access to preventative health coverage, many of these noncitizens will only access healthcare in the most dire, costly, emergency situations. Against the backdrop of H.R. 1, enforcement of the Proposed Rule will not only create substantial cost burdens for the States, but will also undermine public health generally by impeding noncitizens' safe access to state-funded benefits programs.

**c. Current interpretations of public charge**

The 2022 Rule, which is currently effective and which the Proposed Rule seeks to rescind, uses a "'primarily dependent' standard" in considering whether a noncitizen is inadmissible on public charge grounds.[60] Under this Rule, public charge determinations are made considering "public cash assistance for income maintenance," and non-cash benefits (including, for example, most benefits under Medicaid) are not considered.[61]

The current rule also provides clarity as to various common scenarios that may bear on a public charge determination. For example, the 2022 Rule clarifies that, among other things, whether a noncitizen has received a benefit (for the purposes of this determination) hinges on whether that person is a listed *beneficiary* of the benefit; the Proposed Rule provides no such clarification, enabling the possibility that the receipt of a benefit by a noncitizen's family member (such as a child who is a citizen) may be used against the noncitizen. Similarly, the 2022 Rule clarifies that mere application for a benefit does not constitute the receipt of that benefit for the purposes of a public charge determination; the Proposed Rule lacks clarity on this question, and leaves open the possibility that a noncitizen's simply applying for a benefit could lead to an inadmissibility determination. *Id.*

## II. The adoption of the Proposed Rule, rescinding the 2022 Rule, would create extreme ambiguities as to what public charge determinations can be based on, and how those determinations would be made.

The NPRM proposes to rescind the 2022 Rule, creating significant ambiguity regarding how "public charge" will then be understood in the inadmissibility context, while simultaneously providing immigration officials sweeping discretion in making public charge determinations. The preamble of the Rule makes clear that DHS has no intention of returning to the well-

---

public benefits, or minor family members' use of public benefits, against legal permanent residents in the § 1227(a)(5) public charge deportability context. These reports suggest that under the Proposed Rule, some agency officials are likely to interpret lawful use of state and local benefits, or household members' lawful use of benefits, as grounds for a public charge determination for inadmissibility.

[60] 8 C.F.R. § 212.21.

[61] *Id.*

established *status quo ante*—such as, for example, the understandings reflected in the 1999 Guidance. Instead, the NPRM seeks to effectuate the administration's agenda outlined in its executive order titled "Ending Taxpayer Subsidization of Open Borders."[62] The Proposed Rule states that the 2022 Rule's prohibition on consideration of individuals' receipt of short term, supplemental benefits "may have" prevented USCIS from making a determination that an individual "lacked self-sufficiency" and was therefore "likely at any time to become a public charge."[63] Yet DHS declines to provide any new definition of "public charge" or to substantively amend the standards used for public charge determinations. The Proposed Rule would instead, first, eviscerate existing regulations that provide clarity about who is subject to public charge determinations,[64] and, next, place unwarranted discretion in the hands of individual immigration officials, suggesting that these officials should consider *any* use of public benefits in public charge determinations. The end result of this overhaul would be a sweeping change to the current understanding of "public charge," would lack clear limits or guidance, and would be inconsistent with the INA.

**a. The term "public charge" has a long-standing and settled meaning under federal law.**

In the litigation that followed the 2019 Rule, some brought by the undersigned States, *all* appellate court decisions that reached the merits found that the 2019 Rule was likely contrary to the INA. The U.S. Courts of Appeals for the Second, Seventh, and Ninth Circuits all substantially affirmed preliminary injunctions in their respective jurisdictions,[65, 66] but the Proposed Rule makes no attempt to engage with their analyses, or grapple with their conclusions.[67] Instead, it cherry-picks from the available legal authority and ignores the weight of historical judicial and administrative interpretations that have construed the term "public charge" narrowly. This misleading legal analysis, coupled with rescission of the 2022 regulations, would allow immigration officials to apply an astonishingly broad definition of public charge that is not consistent with the INA.

In the 2025 NPRM, DHS relies heavily on PRWORA's definition of "public benefits."[68] But, as discussed in Part I(b), *supra*, that definition of "public benefits" did nothing to alter the meaning of the INA's term "public charge." On the contrary, PRWORA's preservation of public benefits for noncitizens is "in considerable tension" with the Proposed Rule's suggestions that

---

[62] *See* 90 Fed. Reg. at 52,180 (citing Executive Order 14218).
[63] *Id*.
[64] *See, e.g*., 90 Fed. Reg. at 52,192 (removing provisions enumerating the categories of noncitizens who are not subject to public charge grounds).
[65] *Cook Cnty.*, 962 F.3d at 229; *see also New York*, 969 F.3d at 74-80 (2d Cir. 2020); *City and Cnty. of San Francisco*, 981 F.3d at 756-58.
[66] *See Cook Cnty.*, 498 F. Supp. 3d at 1004-05.
[67] *See* 90 Fed. Reg. at 52,179.
[68] *See* 90 Fed. Reg. at 52,175 (citing PRWORA, 8 U.S.C. § 1611(c)).

Congress intended to use the public charge statute to penalize noncitizens who use such benefits.[69] And PRWORA does not "indicate any congressional intention that non-citizens who receive the benefits for which Congress did not render them ineligible risk being considered 'public charges.'"[70]

The Proposed Rule also relies on the affidavit-of-support provision that allows governments to seek reimbursement from an immigrant's sponsor for means-tested public benefits used by the sponsored immigrant.[71] DHS suggests that this requirement is an example of a "policy goal" that it may consider when making public charge determinations in a manner that considers receipt of benefits that Congress (or States), have determined immigrants are legally eligible to receive.[72] But that rationale is not consistent with the history and interpretation of the public-charge provision.[73] The affidavit-of-support provision serves "to get sponsors to take their commitments seriously by making them legally enforceable,"[74] rather than to "depart from the settled meaning of 'public charge.'"[75]

The Proposed Rule relies on similarly erroneous reasoning when it relies on the Victims of Trafficking and Violence Protection Act of 2000 to posit that Congress's prohibition of consideration of prior receipt of benefits by a specific class of aliens "suggests that Congress understood and accepted that consideration of an alien's past receipt of public benefits in other circumstances was appropriate when making a public charge inadmissibility determination."[76] The battered immigrant provisions to which the Proposed Rule refers speak broadly about "benefits," and do nothing to suggest that Congress understood the INA's public charge provision to be anything different than the settled meaning set forth in then-applicable 1999 Guidance. Instead, Congress was simply speaking broadly to provide assurance to vulnerable immigrants who are victims of interpersonal violence, and who are exempt from public charge admissibility assessments.[77]

Overall, the Proposed Rule in its preamble advances faulty interpretations of the law that run counter to decades of Congressional and judicial consideration that has allowed "public charge" to remain a narrowly defined legal term that is well settled.

---

[69] *See New York*, 969 F.3d at 77-78; *Cook Cnty.*, 962 F.3d at 228 ("The statute [PRWORA] did not […] modify the public-charge provision to penalize receipt of non-cash […] assistance.").
[70] *New York*, 969 F.3d at 77.
[71] *See* 8 U.S.C. §§ 1182(a)(4)(c)(ii), 1183a(b)(1)(A).
[72] *See* 90 Fed. Reg. at 52,177.
[73] *See San Francisco*, 981 F.3d at 757-58.
[74] *New York*, 969 F.3d at 79.
[75] *Id*. at 80.
[76] 90 Fed. Reg. at 52,178.
[77] 8 U.S.C. § 1182(a)(4)(E).

**b. The Proposed Rule seeks to expand the meaning of "public charge" far beyond its settled meaning, newly including individuals who use nearly *any* federal or state public benefit.**

DHS now seeks to eliminate those clear boundaries for public charge admissibility and to replace them with a chaotic regime whereby every immigration officer is empowered, at their discretion, to consider virtually any factor they deem "relevant" to a public charge determination.[78]

As DHS acknowledges, the original 1999 Interim Field Guidance was issued to "reduce negative public health and nutrition consequences generated by … confusion [over the meaning of 'public charge'] and to provide aliens, their sponsors, health care and immigrant assistance organizations, and the public with better guidance as to the types of public benefits that INS considered relevant to the public charge determination."[79] But DHS now seeks to eliminate that guidance with no immediate replacement.

DHS acknowledges that the 2022 Rule was an appropriate exercise of DHS's authority to "enumerate exclusive factors to be considered in making public charge inadmissibility determinations without a catch all provision," but nevertheless states that the 2022 Rule "contravenes the clear congressional intent of the statute."[80] So, on the one hand, DHS acknowledges that Congress intended for DHS to issue better guidance and guardrails for immigration officers to follow when making public charge determinations. But on the other hand, DHS now says that, by providing guidance to immigration officers, the 2022 Rule violated congressional intent. This begs the question as to whether and how DHS can in good faith issue any new rules or guidance as to public charge admissibility determinations without violating its own understanding of congressional intent.

DHS now expects that immigration officers will consider "the receipt of *any* type of public benefits by a qualified alien" as "relevant and indeed *critical* in determining whether an alien is actually self-sufficient and able to rely on their own capabilities and the resources of their families, their sponsors, and private organizations rather than depending on public resources to meet their needs."[81] The Proposed Rule provides no limiting language to cabin the scope of public benefits that an individual officer may base an inadmissibility determination on—an unrestricted amount of discretion that could lead to absurd results and will surely result in inconsistent and arbitrary outcomes. By contrast, as an example, the PRWORA statute clarifies that "widely available services," including police and sanitation services, domestic violence programs, and emergency shelters remain among those public benefits and services accessible to

---

[78] Proposed Rule at 52,169.
[79] Proposed Rule at 52,177.
[80] Proposed Rule at 52,181.
[81] Proposed Rule at 52,183 (emphases added).

any resident irrespective of status.[82] The Proposed Rule leaves open the possibility that accessing those very same services—the use of which, for some, is virtually inescapable—could be interpreted by individual immigration officers to render a noncitizen "inadmissible." The result where a noncitizen is deemed a "public charge" for availing themselves of police or sanitation services cannot be what Congress intended, but could flow from the overbroad definition of "public charge" that the Proposed Rule advances.

DHS's asserted interpretation of the statute is inconsistent with the historical understanding of "public charge" that Congress has adopted, as repeatedly affirmed by courts of appeals across the country in connection with litigation over the 2019 Final Rule.[83] At no point has Congress evinced an intent that immigration officers be afforded boundless, unregulated discretion over whether a noncitizen should be disqualified as a public charge, let alone in such far-reaching ways as the Proposed Rule's Preamble conveys.

**c. The Proposed Rule provides no standard as to how benefit use by household members will be treated.**

The Proposed Rule does not look at how the policy would affect individual applicants. Instead, it estimates how entire households make benefit decisions when at least one household member is a noncitizen.[84] There is no explanation of whether, or how, immigration officers will treat the use of benefits by household members who are not the applicant, including household members who are U.S. citizens legally entitled to obtain benefits. The Proposed Rule repeatedly acknowledges that benefit participation and disenrollment decisions occur at the "household" level, and that such decisions, whether by adjustment applicants, spouses, parents, or on behalf of children, including those who are U.S. citizens, are driven by fear, confusion, and attempts to avoid jeopardizing immigration status.[85] DHS devotes a substantial portion of the Proposed Rule to documenting widespread disenrollment and "chilling effects" among mixed-status families, showing disenrollment rates as high as 35% in key safety net programs, including Medicaid, SNAP, and TANF as a result of the 2019 Rule.[86] *See, infra,* Part IV(a). It concedes that a 2022 study found that adults in mixed-status families (25%) were more likely to report chilling effects than citizens or green-card holders (13%) or all-citizen families (7%), leading them to avoid seeking non-cash benefits.[87] Despite this, the Proposed Rule removes all regulatory definitions and exemptions without supplying replacements. It deletes "public cash assistance for income maintenance," "receipt (of public benefits)," and "long-term institutionalization at government

---

[82] 61 Fed. Reg. 45,985 (Aug. 30, 1996) (DOJ interim guidance regarding PRWORA). *See also* 66 Fed. Reg. 3,613 (Jan. 16, 2001) (Final Order).
[83] *See New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 75 (2d Cir. 2020); *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 228 (7th Cir. 2020); *City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs*., 981 F.3d 742, 756 (9th Cir. 2020)
[84] 90 Fed. Reg. at 52,170, 52,193, 52210-52215 (Tables VI.8; VI.10; VI.11).
[85] *Id.* at 52,207-52,209, 52,218.
[86] *Id*. at 52,209.
[87] *Id.*

expense," claiming these terms restrict DHS's ability to act,[88] and in order to "ensure that officers retain their statutorily mandated ability to determine, in their opinion, whether an alien is likely at any time to become a public charge."[89]

DHS then attempts to justify this silence on household benefit use by stating only that officers will make case-by-case determinations under the INA totality-of-the-circumstances test, PRWORA, and "governing caselaw"[90] without offering any explanation of how immigration officers will weigh household benefit use, nor any guardrails to prevent them from treating household benefit use as presumptively indicative of future dependence. (DHS does not identify the case law it sees as "governing," and the NPRM instead signals an intent to depart from—or to selectively invoke—longstanding unbroken judicial precedent.) DHS acknowledges only that guidance and training of immigration officers will come "in the future" in the form of "policy and interpretive tools,"[91] suggesting that DHS intends to issue such guidance without public input or procedural safeguards.[92]

It is impossible to predict all of the consequences of the Proposed Rule's lack of guidance to officers, or the effects of hypothetical future internal guidance. But it is clear that immigration officers would be permitted under the Proposed Rule to penalize immigrants for benefits they did not request, did not control, and/or that were legally accessed by U.S. citizen children or other exempt family members. DHS uses household-level data to justify billions in transfer savings, and leaves open the possibility that the use of benefits by eligible household members will lead to a negative adjudicatory inference. The agency's failure to identify a standard makes it impossible for States to meaningfully evaluate the full extent of the adverse impacts the Proposed Rule will have on families, safety-net programs, or budgets.

**d. The Proposed Rule fails to explain what policy will be in effect after the 2022 Rule is rescinded.**

The Proposed Rule represents a significant change in policy without a reasoned analysis of what new policy will replace the 2022 Rule. Rather than announcing a new policy, DHS states that it intends for this recission to "pave the way" for DHS to—at some indefinite point in the future—"formulate appropriate policy and interpretive tools" to guide DHS officers.[93] In the Executive Summary, DHS vaguely explains that this future guidance will aid officers in making "individualized, fact-specific public charge inadmissibility determinations, based on a totality of

[88] *Id*. at 52,170-52171, 52,185.
[89] *Id.* at 52,181.
[90] *Id.* at 52,170-52,171, 52,188-52190, 52,195.
[91] *Id*. at 52,169, 52,188 (directing that the INA, PRWORA, and governing case law is sufficient guidance for officers to make public charge determinations until DHS creates policy and "interpretive tools" at some point in the future).
[92] *See* 5 U.S.C. 553(b)(A). The guidance exemption covers "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id*.
[93] 90 Fed. Reg. 52,169.

the alien's circumstances, that are consistent with the statute and congressional intent, and comply with past precedent."[94] DHS declines to describe in any more detail what policy would take the place of the 2022 Rule, or how that policy would be implemented.

The Proposed Rule does not reinstate the 2019 Rule. Rather, the rulemaking criticizes the 2019 Rule as overly restrictive of DHS/USCIS, because it provided a finite list of factors that the agency could consider in making a public charge inadmissibility determination, without substantively engaging with all of the reasons why DHS settled on that list.[95] (In any event, that list remains inoperative; DHS removed the 2019 Rule from the Code of Federal Regulations in March 2021, following litigation enjoining and vacating the rule as unlawful.[96])

The Proposed Rule also does not reinstate the 1999 Interim Field Guidance.[97] DHS summarily asserts that DHS officers would consider "controlling precedent and case law" that "largely but not exclusively formed the basis for the 1999 Interim Field Guidance."[98] DHS hints at, but does not actually explain, precisely how its new public charge policies will differ from this guidance.

Because DHS does not specify the details of the policy that will apply to public charge inadmissibility determinations following the proposed recission, DHS fails to adequately explain the proposed change in policy. While the NPRM is clear that immigration officers will have seemingly unfettered discretion in public charge determinations, the NPRM does not provide the States, or the public at large, with meaningful notice and opportunity to comment precisely how various aspects of public benefit use will be construed by these officers. Without more detail and a legitimate opportunity to investigate its potential implications, the States cannot fully evaluate the reasons for this new policy or suggest alternatives.[99]

**e. The Proposed Rule is likely to have unfair and disproportionate impacts.**

The Proposed Rule is likely to have a disproportionate impact on people who are independent and self-supporting but (like many Americans) live with disabilities and other higher healthcare needs. The Rule would allow immigration officials to consider any kind of public supportive services in making public charge determinations, including community-based Medicaid services for people with disabilities and their families. In many states, Medicare and/or Medicaid offers working people with disabilities whose earnings may exceed traditional

---

[94] *Id.*
[95] *Id.* at 52,180.
[96] *Inadmissibility on Public Charge Grounds*; Implementation of Vacatur (Mar. 2021), 86 Fed. Reg. 14,221.
[97] 90 Fed. Reg. 52,193.
[98] *Id.*
[99] *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Medicaid limits the option to receive needed assistance while being self-supporting.[100] The Proposed Rule would unfairly force immigrants with disabilities, and their families, to reject health care programs designed for healthy and independent living because it might put their chances of obtaining permanent residency at risk.

## III. The Proposed Rule will also upend longstanding practices regarding bonds and risk privacy breaches.

The Proposed Rule's deficiencies are not limited to the many questions it does not answer regarding how public charge-based inadmissibility determinations will be made. The Proposed Rule would also create significant changes as to how public charge bonds would be used and suggests future changes in how residents' data will be shared—without explaining how these changes would be consistent with the INA or with Congressional intent.

### a. The Proposed Rule's proposed changes to public charge bonds would create punishing consequences for even minimal use of public benefits.

The Proposed Rule proposes significant changes to the administration of public charge bonds[101] that would create uncertainty in the immigration system, invite arbitrary enforcement, and impose substantial financial and administrative burdens on States. Under the current regulatory framework, public charge bonds are used only where DHS determines an individual may become a public charge, but can be admitted on the condition that the United States is financially protected against foreseeable reliance on public benefits.[102] DHS now proposes to dramatically loosen the constraints on bond cancellation and breach by explicitly stating that receipt of "any means-tested benefit" by an applicant noncitizen, without regard to duration, severity, or causation, will constitute a breach of the bond, regardless of whether the benefit bears any actual relation to long-term dependence or financial self-sufficiency.[103] This "single benefit use = breach" proposal means that accessing short-term Medicaid, enrolling a child in CHIP, or using temporary food assistance during a period of unemployment would breach a bond.

Both the 1999 Guidance and the 2022 Rule advised that receipt of public benefits was relevant only where it indicated ongoing primary dependence.[104] The Proposed Rule discards this and offers no explanation for why it removes "dependent on the government for subsistence" in

---

[100] Medicaid Eligibility Through Buy-In Programs for Working People with Disabilities, Kaiser Family Foundation (2025), https://www.kff.org/medicaid/state-indicator/medicaid-eligibility-through-buy-in-programs-for-working-people-with-disabilities/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[101] 90 Fed. Reg. at 52,185, 52,224.
[102] 8 U.S.C. § 1183; 8 C.F.R. § 213.1; 8 C.F.R. § 103.6.
[103] 90 Fed. Reg. at 52,200, 52,172-52,173.
[104] 87 Fed. Reg. 55,472 (Sept. 9, 2022).

favor of enforcement triggered by *de minimus* welfare use. The Proposed Rule offers no basis for recipients to learn in advance which public benefits might affect a noncitizen's status, or how DHS will interpret household benefit use. And there is no identified procedural protection for individuals subject to bond breach. Instead, the proposed bond structure is completely arbitrary. Because states differ in how they structure, fund, and classify public benefit programs, households with identical income, family size, and immigration status may be treated differently for bond purposes depending solely on the state in which they reside. The Proposed Rule will extend the same chilling effects to bonds that DHS expects in disenrollment and forgone enrollment from benefits. Yet here the chilling itself is an enforcement mechanism.

Remarkably, DHS asserts it "does not anticipate an increase in the number of bonds that are cancelled or breached,"[105] while simultaneously making breach automatic and removing all mitigating factors. This contradiction is not reasoned decision-making and demonstrates reckless disregard for real world program interactions.

**b. The Proposed Rule's reference to data sharing will create a chilling effect on benefits usage and pose risk of privacy violations.**

DHS's preamble contains a vague reference to "data sharing" that will create a predictable chilling effect on the public's willingness to apply for and receive essential public benefits made available to assist families with upward mobility and improve general public health and nutrition.[106] As demonstrated by similar federal actions to share public benefit data, many individuals will avoid benefits for which they, or their families, are eligible if they fear their benefit use will make it more likely that they or their family members will be investigated, detained, or even deported.[107] This chilling effect is not limited to individuals subject to the INA's inadmissibility grounds, but instead includes (i) legal permanent residents who fear their data will be used to detain and deport them, (ii) citizens in mixed status families who fear the information they give will result in ICE targeting their family members, and (iii) anyone

[105] 90 Fed. Reg. 52,173.
[106] 90 Fed. Reg. at 52,183.
[107] *See* Pls.' Notice of Mot. & Mot. for Prelim. Inj. with Mem. of Points & Authorities at 21-23, *California v. HHS*, No. 3:25-cv-05536-VC (N.D. Cal. July 11, 2025), Dkt. No. 42-2, *see also* Pls.' Notice of Mot. & Mot. for Stay or Prelim. Inj. at 23-24*, California v. USDA*, No. 3:25-cv-06310-MMC (N.D. Cal. Aug. 18, 2025), Dkt. No. 59. Indeed, the federal government has already acknowledged that simply asking applicants for sensitive information chills participation in public benefit programs, for example by asking state agencies to not ask for citizenship, immigration status, and SSNs for household members in SNAP applications because these inquiries "may have a chilling effect on the pursuit of the application" and "deter[] households from filing applications," and warning that "[f]ear and misinformation may deter many non-citizens from seeking benefits for which they are eligible—particularly if there are other members in the household who may be ineligible because of their immigration status." U.S. Dep't of Agriculture Memo to SNAP Regional Directors re Conforming to the Tri-Agency Guidance Through Online Applications (Feb. 18, 2011) at 1-2, 5, https://fns-prod.azureedge.us/sites/default/files/Tri-Agency_Guidance_Memo-021811.pdf.

concerned with the privacy of their data.[108] Ultimately, DHS's reference to data sharing will only add to the widespread fear and confusion regarding application of the Proposed Rule—especially given DHS's lack of clarity as to which data it plans on gathering, how it plans to use this data, and how it envisions this information will be used to assist public charge determinations. As a result, the chilling effect of the Proposed Rule will be far higher than DHS acknowledges.

Aside from its chilling effect, the data sharing envisioned in DHS' preamble risks violating several federal privacy laws. These include the Social Security Act and its implementing rules, which limits the use of data collected for the purposes of Medicaid, Medicare, and other Social Security Act programs,[109] the Health Insurance Portability and Accountability Act ("HIPAA"),[110] which regulates the use and disclosure of an individuals' protected health information, the protections outlined in 42 U.S.C. § 290dd-2 and 42 C.F.R. pt. 2, which provide strong protections for the confidentially of substance use disorder related patient records held by federally assisted programs, and the Privacy Act of 1974, which was designed to "provide certain safeguards for an individual against an invasion of personal privacy," and which bars the federal government from the unauthorized use or sharing of data on citizens and lawful permanent residents.[111]

## IV. The impacts of the Proposed Rule will be dire—including a material chilling effect and resulting costs to States—and demonstrates no consideration of reliance interests.

### a. The Proposed Rule will have a chilling effect on residents' legally accessing public benefits.

The Proposed Rule creates uncertainty and fear around whether past, current, or future participation in vital federal, state, and local benefits programs, including by immigrants or their U.S. citizen family members who were eligible and legally entitled to use such benefits, could result in adverse immigration consequences. This uncertainty will reduce participation in these programs. DHS recognizes this. It estimates an "average" disenrollment rate of 17.3% as a direct result of this rule.[112] Eligible immigrant households will avoid food, housing, and health care assistance because of fear that accessing such programs will contribute to a "public charge" finding.[113] Such outcomes are directly at odds with the original understanding of the 1965

---

[108] *See* Br. of Amici Curiae Nat'l Health L., et al. in Support of Pls.' Mot. for Prelim. Inj. at 7-12, *California v. HHS*., No. 3:25-cv-05536-VC (N.D. Cal. Dec. 3, 2025), Dkt. No. 136-1 (detailing chilling effect of sharing Medicaid data with ICE on lawfully present people, including LPRs and citizens).
[109] 42 U.S.C. § 1306(a), 42 C.F.R. § 401.134(a).
[110] Pub. L. 104–191, 110 Stat. 1936 (1996); 45 C.F.R. pts. 160, 164.
[111] Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974).
[112] 90 Fed. Reg. at 52,209.
[113] 90 Fed. Reg. 52,168, 52,209 (Nov. 19, 2025) *citing* Drishti Pillai, Samantha Artiga, "2022 Changes to the Public Charge Inadmissibility Rule and the Implications for Health Care," Kaiser Family Foundation

Immigration and Nationality Act. In 1970, Under Secretary Veneman testified before the Senate Finance Committee that the "whole purpose of the 1965 [A]ct" was to provide "'mainstream medical care' for all the people of this country," reflecting a broad recognition that essential services were intended to be accessible to all residents, including immigrants.[114] The Proposed Rule undermines both the historic purpose and practical functioning of these programs.

DHS recognizes that many who are never or rarely directly subject to public charge determinations—including legal permanent residents; refugees and asylees; and U.S. citizens—will forgo benefits to which they are entitled.[115] But rather than treating these consequences as a regulatory defect, DHS treats them as a benefit, noting that the Proposed Rule will result in a reduction of public benefit "transfer payments" estimated at $8.97 billion annually.[116] The agency does not attempt to distinguish between reducing enrollment through restricted eligibility, versus reducing enrollment through fear, misinformation, or misunderstanding; it treats it all as fiscal savings.

For example, the Proposed Rule concedes that disenrollment and forgone enrollment will occur among populations who are not subject to the public charge test, including children and other family members who are U.S. citizens.[117] Public benefits for children flow through parents and caregivers. When caregivers perceive legal risk, children lose access, even when their eligibility to receive benefits is unaffected. During the 2019 cycle, pediatricians, WIC agencies, and school nutrition programs all reported declines in enrollment among U.S.-citizen children in immigrant households.[118] The authorities that DHS cites acknowledge this: surveys and population-wide analyses show material declines in benefit use across mixed-status families with

---

(KFF) (May 5, 2022), *available at* https://www.kff.org/racial-equity-and-health-policy/2022-changes-to-the-public-charge-inadmissibility-rule-and-the-implications-for-health-care/

[114] Hearings Before the Subcommittee on Medicaid and Medicare of the Senate Finance Committee, 91st Cong., 2d Sess., pt. 1 at 57 (1970) (statement of Honorable John G. Veneman, Under Secretary, Department of Health, Education, and Welfare); *Bay Ridge Diagnostic Laboratory, Inc. v. Dumpson*, 400 F.Supp. 1104, 1106 (E.D. New York 1975) (same).

[115] 90 Fed. Reg. at 52,209; 52,220.

[116] *Id.* at 52,170-52,173 (Table II.1 "Summary of Major Provisions and Economic Impacts of the Proposed Rule").

[117] *Id.* at 52,218; *see also* 90 Fed. Reg. 52,193, 52,209 (DHS acknowledging studies documenting the 2019 rule's chilling effects on populations not subject to the actual standard, that disenrollment rates ranged from 4.1% to 48% across immigrant families, and that mixed-status families were disproportionately impacted, including U.S. citizen families).

[118] *See* Hamutal Bernstein, Dulce Gonzalez, Paola Echave, and Diana Guelespe, "Immigrant Families Faced Multiple Barriers to Safety Net Programs in 2021," Urban Institute (Nov. 2022) *available at* https://www.urban.org/research/publication/immigrant-families-faced-multiple-barriers-safety-net-programs-2021; Drishti Pillai, *et al*., "Health and Health Care Experiences of Immigrants: The 2023 KFF/LA Times Survey of Immigrants," KFF (Sept. 17, 2023) *available at* https://www.kff.org/racial-equity-and-health-policy/health-and-health-care-experiences-of-immigrants-the-2023-kff-la-times-survey-of-immigrants/

U.S. children, despite those children's eligibility.[119] During implementation of the 2019 Rule, 19-21% of adults in immigrant families with children reported that they or a family member avoided or withdrew from non-cash benefits such as SNAP, Medicaid/CHIP, or housing assistance for fear of immigration consequences.[120] DHS is aware of these studies and admitted its own underestimation of the 2019 Rule's chilling effects,[121] but offers no mitigation or analyses of the consequences of this effect on States.

For States, the consequences are direct and severe. The Proposed Rule will lead to under-utilization of primary care and preventative services; reduced vaccination rates; declines in nutritional supports such as SNAP and WIC; increased uncompensated emergency-room and urgent-care use; and greater reliance on emergency food networks. These effects drive higher costs and program churn for state health and human services agencies[122] by immediately reducing funding streams for essential programs and shifting substantial unmet needs to state and local systems.

The Proposed Rule will likely cause some U.S. citizens with families of mixed status to forgo housing assistance for which they are eligible. It will also reduce participation in temporary housing assistance programs that are essential to life and safety in moments of crisis, such as short-term shelters for people who are homeless, for victims of domestic violence, or for runaway, abused, or abandoned children. As the U.S. Department of Housing and Urban Development has acknowledged in a prior proposed rulemaking, such impacts ultimately are likely to "reduce the quantity and quality of assisted housing."[123]

A fundamental flaw of the Proposed Rule is that it treats eligible persons forgoing the use of lawfully available public benefits as an economic boon. DHS's estimate of $8.97 billion in annual benefit savings is comprised of approximately $5.29 billion in foregone federal payments and $3.68 billion in foregone state payments.[124] DHS characterizes this as a mere "reduction in transfer payments,"[125] but it also represents a devastating cost to struggling and vulnerable families. The federal government's supposed cost savings is, in fact, shifting the cost of unmet

---

[119] 90 Fed. Reg. at 52,218 ("reduced access to public benefit programs by eligible individuals, including aliens and U.S. citizens in mixed-status households, may lead to downstream effects on public health, community stability, and resilience. . .").
[120] Randy Capps, Michael Fix and Jeanne Batalova, "Anticipated 'Chilling Effects' of the Public Charge Rule Are Real: Census Data Reflect Steep Decline in Benefits Use by Immigrant Families," Migration Policy Institute (December 2020) *available at* https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real
[121] 90 Fed. Reg. at 52,208.
[122] Multistate Comment Letter from the Attorneys General of California, New York, Illinois, and Other States to DHS on Public Charge Ground of Inadmissibility (Oct. 22, 2021).
[123] U.S. Dep't of Hous. & Urban Dev., Regulatory Impact Analysis, Dkt. No. FR-6124-P-01, at 3 (Apr. 15, 2019).
[124] 90 Fed. Reg. at 52,196, 52,199, 52,208.
[125] *Id.* at 52,170, 52,215-52,219

health care, food, and housing needs for immigrants and their U.S.-citizen children to state and local emergency systems. *See, infra*, Part IV(b). The Proposed Rule will save little, and instead shifts costs for critical services to states and families less able to bear them.

**b. States will bear substantial increased administrative and fiscal costs due to the Proposed Rule.**

DHS concedes that immigrant families will respond to the Proposed Rule by avoiding essential programs. While the Rule's ambiguity and vagueness will cause disenrollment even before the rule is implemented, the underlying medical, housing, and nutrition needs will not disappear; they will simply reappear as uncompensated care and emergency assistance that state and local governments, and their safety net systems, must absorb. DHS acknowledges this dynamic in passing, noting that "other qualitative, unquantified effects" of the rule will likely include adverse health effects, additional medical expenses due to delayed care, potential lost productivity, and administrative changes to business processes for providers and agencies.[126] However, these downstream costs are not quantified or considered in the Proposed Rule's presentation of reduced transfer payments. The Proposed Rule ignores that Medicaid, CHIP, and many other programs are jointly financed between the states and federal government. Therefore, every dollar of forgone federal "transfer" typically requires states either to backfill coverage with their own funds, or to absorb greater uncompensated care and emergency assistance burdens.

According to the tables in the NPRM, Medicaid and CHIP will bear the brunt of the projected disenrollment. DHS estimates a 10.3% disenrollment or forgone enrollment rate among households, including noncitizens, which would reduce federal Medicaid/CHIP transfer payments by about $3.43 billion annually, with a combined federal-state reduction of about $5.82 billion per year.[127] Using an average federal medical assistance percentage ("FMAP") of 59%, DHS calculates that state Medicaid/CHIP contributions would fall by roughly $2.38 billion annually due to disenrollment among "aliens and their households."[128] DHS acknowledges elsewhere that delayed care and reliance on emergency services will increase costs throughout the system,[129] but it wholly ignores these costs to States, localities, and their safety net hospitals (and the potentially catastrophic costs to individuals) when it characterizes the reduction in benefits to eligible populations as a financial windfall.

These reductions would have massive fiscal and economic consequences for the States. Nationally, total Medicaid spending in FY24 was approximately $909 billion.[130] In California,

---

[126] 90 Fed. Reg. at 52,198-52,199, 52,218.
[127] *Id.* at 52,215-52,216.
[128] *Id.*
[129] 90 Fed. Reg. 52,218-52,219.
[130] Kaiser Family Foundation, "Total Medicaid Spending FY 2024" *available at* https://www.kff.org/medicaid/state-indicator/total-medicaid-

where combined federal and state Medicaid spending totaled approximately $124 billion and federal funds account for roughly two-thirds of program financing,[131] the projected reductions translate to an estimated loss of approximately $500 million per year in Medicaid/CHIP funding, or $5 billion over ten years.[132] New York faces comparable impacts, with combined federal and state Medicaid spending of approximately $98 billion.[133] The NPRM's projected reductions would result in an estimated loss of roughly $400 million annually, or nearly $4 billion over ten years. Illinois's proportionate loss would be similar, where combined federal and state Medicaid spending totaled approximately $32.3 billion, with roughly $21 billion—about 65%—financed by the federal government,[134] resulting in an estimated loss of approximately $130 million per year, or $1.3 billion over ten years. Although absolute dollar impacts vary by state size, the NPRM imposes material and proportionate fiscal harms across all undersigned States, each of which depends on stable federal Medicaid financing to sustain access to care for vulnerable populations and to ensure that hospitals are able to meet their obligations to provide emergency services under the Emergency Medical Treatment and Labor Act ("EMTALA").[135]

The fear and uncertainty that will be caused by the Proposed Rule translates into measurable fiscal losses for states and safety-net providers. Urban Institute surveys found that the 2019 Rule that sought to expand "public charge" inadmissibility led one in seven adults in immigrant families to avoid public benefit programs because of green-card concerns, and that *more than 20%* of adults in immigrant families avoided non-cash safety-net programs for immigration-related reasons.[136] Though implementation of the 2019 Rule was halted in March 2021, fear persisted among immigrant families up through 2022, when one in six adults in immigrant families with children reported avoiding non-cash benefits due to green-card concerns, and nearly one in four adults in mixed-status families did so.[137] A Manatt analysis of

---

spending/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

[131] KFF "Medicaid State Fact Sheet, Percent of People Covered by Medicaid, 2023 (California)," (May 20, 2025) *available at* https://files.kff.org/attachment/fact-sheet-medicaid-state-CA.

[132] State-level estimates reflect each state's approximate share of national Medicaid expenditures applied to the NPRM's $3.68 billion annual reduction in state-share transfer payments.

[133] KFF "Medicaid State Fact Sheet, Percent of People Covered by Medicaid, 2023 (New York)," (May 20, 2025) *available at* https://files.kff.org/attachment/fact-sheet-medicaid-state-NY.

[134] KFF "Medicaid State Fact Sheet, Percent of People Covered by Medicaid, 2023 (Illinois)," (May 20, 2025) available at https://files.kff.org/attachment/fact-sheet-medicaid-state-IL.

[135] 442 U.S.C. § 1395dd.

[136] Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, Stephen Zuckerman, "One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018," Urban Institute (May 22, 2019) *available at* https://www.urban.org/research/publication/one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018.

[137] Dulce Gonzalez, Jennifer M. Haley, Genevieve M. Kenney, "One in Six Adults in Immigrant Families with Children Avoided Public Program in 2022 Because of Green Card Concerns," Urban Institute (Nov. 30, 2023) *available at* https://www.urban.org/research/publication/one-six-adults-immigrant-families-children-avoided-public-programs-2022.

the 2019 Rule estimated billions of dollars in reduced federal Medicaid payments and significant job losses when eligible families disenrolled out of fear.[138] Federal courts reviewing the 2019 Rule found that it was likely to cause substantial fiscal and public health harms from disenrollment and increased uncompensated care.[139] The Proposed Rule would magnify the effects of the 2019 Rule because it encourages eligible families to avoid Medicaid, CHIP, SNAP, and housing supports—not because of any change in statutory eligibility, but because of a generalized fear that any connection to means-tested benefits could be used against them in a discretionary public-charge determination.[140] The NPRM's treatment of these fiscal harms is incomplete, requiring the States to conduct their own detailed analyses of these harms within an already-truncated public comment period.

Furthermore, DHS acknowledges that there will be costs associated with "regulatory familiarization," staff training, and IT changes for hospitals, nonprofits, and state Medicaid agencies, but offers no quantitative estimate and treats these burdens as minor.[141] DHS's analysis fails to consider the full costs of the 2019 Rule as one indicator of the potential costs of the Proposed Rule. Implementing the 2019 Rule required extensive systems reprogramming, vendor contract modifications, retraining of eligibility workers, development of new compliance protocols, and significant coordination with federal data-matching systems.[142] Providers and community organizations faced higher transactions costs due to increased screening, documentation, and counseling needs for affected families.[143]

---

[138] Alice J. Lam, "DHS Public Charge Regulation Could Drive Medicaid Coverage Losses," Manatt on Health: Medicaid Edition (Aug. 29, 2019) *available at* https://www.manatt.com/Insights/Newsletters/Manatt-on-Health-Medicaid-Edition/DHS-Public-Charge-Regulation-Could-Drive-Medicaid.

[139] *See, e.g., New York v. United States Department of Homeland Security*, 969 F.3d 42 (2020)(holding that states had standing based on anticipated fiscal harms and that DHS's own analysis acknowledged decreased federal funding and increased uncompensated care); *City and County of San Francisco v. United States Citizenship and Immigration Services*, 981 F.3d 742 (2020)(finding DHS failed to adequately consider detailed economic studies projecting disenrollment and fiscal impacts, violating APA requirements); *Cook County, Illinois v. Wolf*, 962 F.3d 208 (2020)(holding the rule likely violated arbitrary and capricious standard due to DHS's failure to consider state and local government reliance interests and public health consequences).

[140] 90 Fed. Reg. at 52,183, 52,189.

[141] *Id.* at 52,183, 52,189.

[142] *See, e.g., Cook County, Illinois v. Wolf*, 962 F.3d 208, 218-219; 233-234 (2020) (holding that both Cook County and the Illinois Coalition for Immigrant Refugee Rights had standing based on financial harms and resource diversions caused by the 2019 Rule); *La Clinica de la Raza v. Trump*, 706 F. Supp. 3d 903, 917 (2020) (finding organizational standing based on harms caused by diversion of resources and direct financial consequences resulting from implementation of the 2019 Rule); *Cf. City and County of San Francisco v. United States Citizenship and Immigration Services,* 944. F.3d 773, 884 (2019) (granting DHS' emergency motion to stay injunctions related to implementation of the 2019 Rule).

[143] *Id.*; *see also* Samantha Artiga, Drishti Pillai, Sammy Cervantes, Akash Pillai, and Matthew Rae, "Potential 'Chilling Effects' of Public Charge and Other Immigration Policies on Medicaid and CHIP

The Proposed Rule's projected "reductions in transfer payments" are therefore better understood as a combination of lost federal revenue for states and shifted costs. When immigrant families avoid Medicaid, costs move to emergency departments and uncompensated care. When families avoid SNAP, food insecurity rises and local food banks (not federally reimbursed programs) absorb the gap. When families avoid CHIP, state and locally funded children's health programs absorb treatment costs. In states like Illinois, for example, where Medicaid already constitutes a large share of the budget, the Proposed Rule threatens billions of dollars in forgone federal funds and a substantial increase in uncompensated care and emergency assistance costs that DHS has not meaningfully analyzed.

**c. The Proposed Rule does not consider any impacted parties' reliance interests.**

The Proposed Rule fails to account for the reliance interests engendered by DHS's public charge framework, reflected in decades of agency practice and codified in the 2022 Rule. DHS concedes that "the … public may be relying on aspects of the regulatory scheme in the 2022 Final Rule,"[144] but does not identify what those interests are, nor analyze how they arose, nor consider alternatives. Instead, the Proposed Rule pivots to the conclusory assertion that the prior rules did not provide an "effective path"[145] for public charge determinations, without conducting any reasoned analysis of reliance interests at all.

When an agency changes course, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account, and that failure to do so renders the change arbitrary and capricious.[146] DHS has not met its obligation here. The Proposed Rule eliminates entirely the definition of "public charge" and replaces it with discretionary case-by-case enforcement, while failing to account for reliance interests created by the 2022 Rule. While it is appropriate for DHS to solicit information about reliance interests during notice and comment, the Proposed Rule does not itself identify those interests or articulate how the prior framework shaped decision-making. And, tellingly, the Proposed Rule takes away every element that created those reliance interests in the first place.

---

Enrollment," KFF (Dec. 2025) *available at* https://www.kff.org/medicaid/potential-chilling-effects-of-public-charge-and-other-immigration-policies-on-medicaid-and-chip-enrollment/#:~:text=The%20proposed%20rule%20will%20likely,%2C%20food%2C%20and%20housing%20providers.

[144] 90 Fed. Reg. at 52,193.

[145] *Id*. at 52,193.

[146] *See Department of Homeland Security v. Regents of the Univ. of Cal.,* 591 U.S. 1, 30 (2020) (it was arbitrary and capricious to ignore the fact that DACA recipients have structured their lives in reliance on the program). *See also Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 41-42 (1983) (an agency rescinding its rule is obligated to supply a reasoned analysis for the change)*; FCC v. Fox Television Stations,* 556 U.S. 502 (2009) (when an agency flips long-standing policy, it must acknowledge the change and consider serious reliance interests engendered by the prior policy).

The Proposed Rule rescinds every protection previously provided and consistently relied upon—§§ 212.20, 212.21, 212.22, and 212.23—and eliminates core definitions of "likely at any time to become a public charge," "public cash assistance," and "receipt," which provided clarity and predictability under the prior framework.[147] DHS proposes no replacement standards, instead asserting that officers will exercise individualized discretion based on the "totality of the circumstances."[148] This shift disregards the reliance interests of individuals, particularly those who lawfully used benefits or qualified under longstanding exemptions, who may now face potential adverse consequences without any explanation of how those reliance interests will be protected.

For more than two decades—from the 1999 Guidance through the 2022 Rule—the public charge test centered on cash assistance for income maintenance and long-term institutionalization, with a corollary understanding that use of nutrition, health, or housing benefits would not jeopardize admissibility. Individuals and families, including applicants in humanitarian categories expressly exempt from public charge determinations, structured decisions about benefit use and immigration pathways in reliance on that framework.

The Proposed Rule also introduces a potentially retroactive effect by failing to exclude past, fully lawful benefit use—previously clearly excluded from consideration—from the discretionary "totality of the circumstances" analysis. Individuals who acted lawfully and rationally under the existing regulatory protections risk being penalized based on conduct that was expressly permitted under prior law. Courts routinely strike down policies that jeopardize individuals who acted in reliance on prior rules without meaningful explanation for disregarding those reliance interests.[149] The Proposed Rule does not even engage the reliance question; it simply states that because discretion will be individualized, applicants can offer evidence to rebut adverse inferences.[150] But reliance on clear rules established over multiple decades is not mitigated by a program of unfettered, individualized discretion.

The destabilization is particularly acute for individuals historically exempt from public charge risk—refugees, asylees, T-visa holders, U-visa holders, special juvenile immigrants, and other humanitarian categories. The 2022 Rule codified the government's longstanding position that Congress intended these populations to be exempt.[151] By deleting § 212.23 without replacement,[152] the Proposed Rule places individuals who adjusted status under exempt pathways—often many years ago—into uncertainty. For example, a refugee who used Medicaid in reliance on prior practice and later adjusted to Lawful Permanent Resident status could, under

[147] 90 Fed. Reg. at 52,171-52,172.
[148] *Id.* at 52,183.
[149] *See, supra,* note 143.
[150] 90 Fed. Reg. at 52,183, 52,188.
[151] 87 Fed. Reg. 55,472, 55,474 (Sept. 9, 2022) (codifying exemptions); 8 C.F.R. 212.23.
[152] 90 Fed. Reg. at 52,170-52,171.

the new framework, be deemed likely to become a public charge based, in part, on their past benefit use.

The Proposed Rule offers no analysis of how prior reliance on benefits used within exempt categories will be treated under the new discretionary framework. Any final rule must make clear (as the 2019 Final Rule made clear)[153] that prior lawful use of eligible benefits—particularly by individuals previously exempt from public charge determinations—cannot be considered a factor in finding any individual likely to become a public charge.

## V. To the extent that the 2022 Rule is replaced by sub-regulatory guidance, this process would create significant harms, including lack of transparency, accountability, or opportunity for public comment.

The reliance problems described above are exacerbated by the fact that the NPRM proposes rescinding the 2022 Rule, but does not state what would replace it or even whether DHS intends to redefine "public charge" through formal rulemaking. That lack of clarity creates even more uncertainty for the States and immigrants, which carries significant harms. As with the elimination of clear, publicly available guidance, replacing the 2022 Rule with sub-regulatory guidance would create additional problems.

The Administrative Procedure Act requires agencies to "give interested persons an opportunity to participate in [] rule making[.]"[154] Courts have therefore taken issue with the use of sub-regulatory guidance in place of formal rulemaking.[155] And the Department of Justice recently determined that "[g]uidance documents violate the law when they are issued without undergoing the rulemaking process established by law yet purport to have a direct effect on the rights and obligations of private parties governed by the agency or otherwise act as a substitute for rulemaking."[156] If DHS and USCIS proceed along the lines implied by the Proposed Rule, and replace the rescinded 2022 Rule with sub-regulatory guidance that was not subject to the rulemaking process, this opaque course would improperly foreclose the robust and transparent public comment period required for changes as significant as those at issue in the context of public charge determinations of inadmissibility.

Moreover, the reliance harms described above would be aggravated if DHS were to rely on sub-regulatory guidance to guide public charge determinations. That guidance would be subject to revocation or alteration at any time, without notice or public participation. Indeed, that is the

---

[153] *See* 84 Fed. Reg. 41,292, 41,320-41,321 (Aug. 14, 2019) (affirming the 2019 Final Rule's prospective application).
[154] 5 U.S.C. § 553(c).
[155] *See Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C. Cir. 2014); *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, 2010 WL 3431761, at *19 (E.D. Pa. Aug. 30, 2010).
[156] Memorandum from Attorney General Pam Bondi (Feb. 5, 2025) (*available at* https://www.justice.gov/ag/media/1388511/dl?inline).

very purpose of notice-and-comment procedures, which are not a mere formality but "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."[157] They also "attempt[] to provide a 'surrogate political process' that takes some of the sting out of the inherently undemocratic and unaccountable rulemaking process."[158]

## VI. Conclusion

If finalized, the Proposed Rule will harm the undersigned States, our residents, and our public resources. The proposed, seemingly unbounded expansion of "public charge" will penalize immigrants and their families for lawfully accessing resources that are, indeed, intended in part for them. The Proposed Rule represents an impermissible departure from Congress's and the courts' interpretations of "public charge," is contrary to law, and constitutes an arbitrary and capricious change in longstanding policy. We strenuously object to the Proposed Rule and respectfully request its withdrawal.

Sincerely,

Letitia James
Attorney General of New York

Kwame Raoul
Attorney General of Illinois

Rob Bonta
Attorney General of California

Keith Ellison
Minnesota Attorney General

Philip J. Weiser
Attorney General of Colorado

William Tong
Attorney General of Connecticut

[157] *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).
[158] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 70 n.13 (2020) (Thomas, J., dissenting).

Kathleen Jennings
Attorney General of Delaware

Anne E. Lopez
Attorney General of Hawai‘i

Aaron M. Frey
Attorney General of Maine

Anthony Brown
Attorney General of Maryland

Andrea Joy Campbell
Attorney General of Massachusetts

Dana Nessel
Attorney General of Michigan

Aaron D. Ford
Attorney General of Nevada

Dan Rayfield
Attorney General of Oregon

Peter Neronha
Attorney General of Rhode Island

Charity R. Clark
Attorney General of Vermont

Nicholas W. Brown
Attorney General of Washington

Brian Schwalb
Attorney General of the District of Columbia

Matthew J. Platkin
Attorney General of New Jersey

Raúl Torrez
Attorney General of New Mexico